ROLAND C. WINTERSTEIN ET UX. *v.* WILLIAM
E. WILCOM T/A 75-80 DRAG-A-WAY

[No. 43, September Term, 1972.]

*Decided August 10, 1972.*

The cause was argued before MORTON, ORTH and MOY-LAN, JJ.

*Alan Edgar Harris* and *Edward F. Seibert* for appellants.

*Daniel W. Cagan,* with whom were *Adelberg, Rudow & Blanton* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

## I

"REQUEST AND RELEASE

I, the undersigned, hereby request permission to enter the premises of 75-80 DRAG-A-WAY, PIT AREA, STAGING AREA, and participate in auto timing and acceleration runs, tests, contests and exhibitions to be held this day. I have inspected the premises and I know the risks and dangers involved in the said activities, and that unanticipated and unexpected dangers may arise during such activities and I assume all risks of injury to my person and property that may be sustained in connection with the stated

and associated activities, in and about the premises.

In consideration of the permission granted to me to enter the premises and participate in the stated activities, and in further consideration of the provisions of a insurance medical plan, I do hereby, for myself, my heirs, administrators and assigns, release, remise and discharge the owners, operators, and sponsors of the said premises, of the activities, of the vehicles, and of the equipment therein, and their respective servants, agents, officers, and officials, and all other participants in the stated activities of and from all claims, demands, actions, and causes of action of any sort, for injuries sustained by my person and/or property during my presence in said premises and participation in the stated activities due to negligence or any other fault.

I represent and certify that my true age is stated below, and if I am under the age of 21 years, I do represent and certify that I have the permission of my parents and/or guardians to participate in the stated activities, and that they have full knowledge thereof.

I certify that my attendance and participation in the stated activities is voluntary, and that I am not, in any way, the employee, servant, or agent of the owners, operators or sponsors of the premises and the activities therein.

I HAVE READ AND UNDERSTAND THE FOREGOING REQUEST AND RELEASE.

In Witness Whereof, I have hereunto set my hand and seal. . . ."

The effectiveness of this document to hold harmless WILLIAM A. WILCOM, trading as 75-80 Drag-A-Way, defendant-appellee (Wilcom), is the crux of the case before us. ROLAND C. WINTERSTEIN and BARBARA

WINTERSTEIN, his wife, plaintiffs-appellants (Winterstein), claim that it is void as against public policy and not "conclusively binding upon them as their intentional and unreasonable exposure to danger, which [Wilcom] knew or had reason to know." Wilcom asserts it was a binding contract relieving him of responsibility for damages in accordance with its terms. The lower court agreed with Wilcom and so do we.

## II

The case arose by the filing of an action in tort by Winterstein against Wilcom in the Circuit Court for Frederick County. The first count of the declaration set out that Wilcom was in possession of real property at the junction of Maryland State routes 75 and 80. On the property he operated a business called 75-80 Drag-A-Way. Automobile timing and acceleration runs were conducted on two racing lanes. Wilcom's employees were in a tower to watch "for any hazards on the track," in the pits to inspect participating vehicles prior to each run, and at the end of the course to time the run. Roland Winterstein saw an advertisement of the runs and on 9 June 1967 went to the track to participate in speed contests in the "C gas class." He paid the stated fee. Near the end of his run his car "hit a cylinder head approximately 36″ long, 6″ wide and 4″ high, weighing approximately 100 pounds * * * which was not visible to him when he commenced the race" but was visible to Wilcom's employees in the tower. He lost control of his car, jumped a ditch, drove up an embankment and turned over. He sustained "serious, painful and permanent injuries." The declaration claimed that the crash and resulting injuries were due solely to the negligence of Wilcom and specified acts of omission and commission demonstrating that Wilcom had been careless. Roland Winterstein claimed $75,000. The second count was a joint claim by Roland and Barbara Winterstein for $35,000 for damages and losses to their marital relationship.

Wilcom pleaded the general issue. He then requested

in writing an admission that two documents attached as exhibits to the request were genuine. Maryland Rule 421 a. Each was entitled "REQUEST AND RELEASE", read as above set out, was dated 9 June 1967 and was witnessed by Wilcom. One, stamped No. 176, bore the signature under seal of Roland Winterstein and the other, stamped No. 177, bore the signature under seal of Barbara Winterstein. No response was served within the time prescribed by Rule 421 b 1, and therefore under Rule 421 b 2 the genuineness of the documents was deemed to be admitted. Thereafter Wilcom moved for a summary judgment in his favor. Rule 610. Upon the Motion and Memorandum of Points and Authorities, no answer having been filed and no hearing requested, the court by its order entered summary judgment in favor of Wilcom "with respect to each and every count", and dismissed the action with prejudice, all costs to be paid by Winterstein. Winterstein appealed.

## III

The first question is whether the releases were void as against public policy.

*Eastern Ave. Corp. v. Hughes,* 228 Md. 477, was concerned with a clause in a lease providing that the landlord would not be liable for injury to the person of the tenant or damages to his property.[1] The court upheld the validity of the clause, following what it found to be the great weight of authority, namely that exculpatory clauses are valid. It noted, at 480, that "the only state in which an exculpatory clause has been held invalid as against public policy appears to be New Hampshire." However, it observed that in some states, subsequent to

---

1. The clause read: "The Tenant covenants and agrees that the Landlord shall not be liable for any injury to his person or damages to his property occasioned by failure to keep the demised premises in repair or howsoever caused, nor shall the Landlord be responsible for any accident to the Tenant or any occupant or visitor to the premises resulting from any cause whatsoever; and Tenant agrees he will not hold Landlord responsible in any way, whether such accident occurred in any of the Landlord's buildings or on any of its property." 228 Md. at 479.

a judicial decision upholding such claims, the legislature had enacted statutes invalidating some types of exculpatory clauses. The General Assembly of Maryland apparently responded to the observation. But it voided as against public policy only exculpatory clauses in agreements between landlord and tenant, ch. 124, Acts 1964, leaving the law otherwise as it stood.[2]

### The General Rule of Law Regarding Exculpatory Clauses

In the absence of legislation to the contrary, the law, by the great weight of authority, is that there is ordinarily no public policy which prevents the parties from contracting as they see fit, as to whether the plaintiff will undertake the responsibility of looking out for himself. "It is quite possible for the parties expressly to agree in advance that the defendant is under no obligation of care for the benefit of the plaintiff, and shall not be liable for the consequences of conduct which would otherwise be negligent." Prosser, *Law of Torts*, 3rd Ed. (1964) § 67, p. 456. In other words, the parties may agree that there shall be no obligation to take precautions and hence no liability for negligence.

### Exceptions to the General Rule

There is a proviso to the general rule. The relationship of the parties must be such that their bargaining be free and open. When one party is at such an obvious disadvantage in bargaining power that the effect of the contract is to put him at the mercy of the other's negli-

---

2. Ch. 124, Acts 1964, codified as Code, Art. 53, § 40 reads: "Any provision of a lease or other rental agreement relating to real property whereby a lessee or tenant enters into a covenant, agreement or contract, by the use of any words whatsoever, the effect of which is to indemnify the lessor or landlord or hold the lessor or landlord harmless, or preclude or exonerate the lessor or landlord from any or all liability to the lessee or tenant, or to any other person, for any injury, loss, damage or liability arising from any omission, fault, negligence or other misconduct of the lessor or landlord on or about the leased or rented premises or on or about any elevators, stairways, hallways or other appurtenances used in connection therewith, and not within the exclusive control of the lessee or tenant, shall be deemed to be against public policy and void."

gence, the agreement is void as against public policy. The proviso is applicable on this basis between employer and employee.

It is also against public policy to permit exculpatory agreements as to transactions involving the public interest, as for example with regard to public utilities, common carriers, innkeepers and public warehousemen. Prosser feels that there has been a definite tendency to expand the exception raised by the proviso to other professional bailees who are under no public duty but deal with the public, such as garagemen, owners of parking lots, and parcel checkrooms, because the indispensable need for their services deprives the customer of all real equal bargaining power. He finds decisions divided as to other private, bailees for hire, the decision likely to turn upon the extent to which it is considered that the public interest is involved. Id., at pp. 457-458.

Generally, exculpatory agreements otherwise valid are not construed to cover the more extreme forms of negligence—wilful, wanton, reckless or gross. Nor do they encompass any conduct which constitutes an intentional tort. Id., at p. 459. And, of course, it is fundamental that if an agreement exempting a defendant from liability for his negligence is to be sustained, it must appear that its terms were known to the plaintiff, and "if he did not know of the provision in his contract and a reasonable person in his position would not have known of it, it is not binding upon him, and the agreement fails for want of mutual consent." Id., at p. 458.

### Transactions Affected with a Public Interest

Because an exculpatory provision may not stand if it involves the public interest, see 175 A.L.R. 8 (1948), our inquiry turns to what transactions are affected with a public interest. In *Tunkl v. Regents of the University of California,* 383 P. 2d 441 (1963) the Supreme Court of California, in bank, found that in placing particular contracts within or without the category of those affected with a public interest, the courts have revealed a rough

outline of that type of transaction in which exculpatory provisions will be held invalid. "Thus the attempted but invalid exemption involves a transaction which exhibits some or all of the following characteristics. It concerns a business of a type generally thought suitable for public regulation. The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents." At 445-456 (footnotes citing authorities omitted).

We note a further refinement. Although the traditional view has been that where the defendant's negligence consists of the violation of a statute, the plaintiff may still assume the risk, there is a growing tendency to the contrary where a safety statute enacted for the protection of the public is violated. The rationale is that the obligation and the right so created are public ones which it is not within the power of any private individual to waive. *Prosser, supra,* at 469. See *Guerrero v. Westgate Lumber Co.,* 164 Cal. App. 2d 612, 331 P. 2d 107 (1958) ; *Casey v. Atwater,* 22 Conn. Super. 225, 167 A. 2d 250 (1960) ; *McCarthy v. National Association for Stock Car Auto Racing, Inc.,* 226 A. 2d 713 (N.J. 1967).

## IV

It is clear that the exculpatory provisions involved in the case before us whereby Winterstein expressly agreed in advance that Wilcom would not be liable for the consequences of conduct which would otherwise be negligent were under the general rule recognizing the validity of such provisions. There was not the slightest disadvantage in bargaining power between the parties. Winterstein was under no compulsion, economic or otherwise, to race his car. He obviously participated in the speed runs simply because he wanted to do so, perhaps to demonstrate the superiority of his car and probably with the hope of winning a prize. This put him in no bargaining disadvantage.

The business operated by Wilcom had none of the characteristics of one affected with the public interest. The legislature has not thought it suitable for public regulation for it has not sought to regulate it. Wilcom is not engaged in performing a service of great importance to the public which is a matter of practical necessity for any member of the public. Wilcom does not hold himself out as willing to perform the service for any member of the public coming within certain established standards; we see nothing to indicate that he may not arbitrarily refuse to permit any person to participate in the speed runs. Since the service is not of an essential nature Wilcom had no decisive advantage of bargaining strength against any member of the public seeking to participate. Nor was Winterstein so placed under the control of Wilcom that he was subject to the risk of carelessness by Wilcom or his agents; Winterstein was under no obligation whatsoever to race his car.

We do not believe that any safety statute of this State, enacted for the protection of the public, was involved. Our attention has not been called to, nor are we aware of, such a statute dealing with activities of the nature conducted by Wilcom.

We observe that Winterstein did not allege that the

negligence he attributed to Wilcom was other than simple negligence; he characterized Wilcom's omissions and commissions as careless, not wilful, wanton, reckless or gross; he does not say that he was wronged by an intentional tort.

The short of it is that as to the releases here the effect of the exemptive clauses upon the public interest was nil. We find that each release was merely an agreement between persons relating entirely to their private affairs. In the absence of a legislative declaration, we hold that they were not void as against public policy.

Our holding finds support in other jurisdictions on comparable facts. In *French v. Special Services, Inc.,* 159 N.E.2d 785 (Ohio 1958) the cases arose out of an action for damages, in negligence, against the proprietor of a race track by parties who engaged in stock car races for prizes. Negligence, not wanton or wilful misconduct was alleged and it was admitted by the plaintiffs that prior to their entry into the races, they signed a release, the provisions of which were in substance those of the releases before us. The Court of Appeals of Ohio quoted the trial court with approval, at 787:

> "The defendant, Special Services, Inc., not being a public utility or common carrier, and not owing any obligation of public trust to the plaintiff, a contestant, and not being the plaintiff's employer; the court finds that plaintiff and defendant were free to contract in such a manner as to relieve the defendant from the responsibility for damage or injuries to the plaintiff, caused by the defendant's negligence, excepting when caused by wilful or wanton misconduct."

The appellate court found "forceful reasons why public policy does not require that such a release be declared invalid and affirmed the judgments of the lower court on the pleadings for the defendants." *Hine v. The Dayton Speedway Corp. et al.,* 252 N.E.2d 648 (Ohio 1969) fol-

lowed *French* and construed it as provided in its syllabus as holding:

"1. A participant in a stock car race and the proprietor thereof are free to contract in such a manner as to relieve the latter from the responsibility for damages or injuries to the former caused by the latter's negligence, excepting when caused by wilful or wanton misconduct. 2. An agreement between a participant in and the proprietor of a stock car race, whereby the former assumes the risk of injuries resulting from his participation in such event and releases the proprietor from any claims for damages, is not invalid as against public policy."

*McCarthy v. National Association for Stock Car Auto Racing, Inc., et al., supra,* involved a release in substance not unlike the releases before us. The case turned on the fact that in New Jersey the legislature had taken an interest in the field and had expressed its policy by providing for licensing and for regulation designed for the safety of both participants and spectators and a safety statute had been violated.[3] But in the course of the opinion the court said, at 714:

"In several of our sister states, releases by stock car drivers have been sustained. See French v. Special Services, Inc., 107 Ohio App. 435, 159 N.E.2d 785 (Ct.App.1958); Corpus Christi Speedway v. Morton, 279 S.W.2d 903 (Texas Civ.App.1955); Theroux v. Kedenburg Racing Association, 50 Misc.2d 97, 269 N.Y.S.2d 789 (Supp.Ct.1965); cf. Del Santo v. Bristol County Stadium, Inc., 273 F.2d 605 (1 Cir.1960). But in those states there were no statutes or regulations evidencing public policy

---

3. The court held: "The prescribed safety requirements may not be contracted away, for if they could be the salient protective purposes of the legislation would largely be nullified." 226 A. 2d at 715.

or official interest in this field of activity. So far as appears, stock car races in those jurisdictions are wholly ungoverned and parties are at liberty to enter into such private relations and arrangements as they choose."

And at 715 it quoted with approval *Boyd v. Smith*, 372 Pa. 306, 94 A. 2d 44 (Sup. Ct. 1953):

"Such a protective clause is undoubtedly valid and enforceable if it does not contravene any policy of the law, that is, if it is not a matter of interest to the public or the State but merely an agreement between persons relating entirely to their private affairs."

## V

In oral argument before us Winterstein called attention to Code, Art. 79, § 11 which provides:

"In any and all cases in which any person sustains personal injuries as a result of a tort alleged to have been committed against such person, any release of the claim of such injured person for damages resulting from such tort, signed by such injured person within five days of the infliction of said injuries, and any power of attorney to or contract of employment of an attorney at law, with reference to recovery of damages for such tort, signed by such party within five days after the infliction of such injuries, shall be voidable within sixty days at the option of such injured party." [4]

He suggested that the release here was in contravention of that statute. The point was not tried and decided below and so is not properly before us. Rule 1085. Nor was it presented as a legal proposition in his brief and we

4. As first enacted by Acts 1936, Special Session, ch. 38 the time limitations were within two days of the infliction of the injuries. Acts 1955, ch. 480, § 1 changed the period to five days.

may decline to consider it for that reason. Rule 1046 f. In any event it is patent that the statute by its terms does not apply to the release here. It was the clear legislative intent that only releases signed within the specified period *after* the commission of the tort be voidable at the option of the injured party, apparently to regulate a practice not involved in the situation before us. We note that were the proper construction that the statute apply to releases exculpating a defendant before the commission of the tort giving rise to damages there would have been no need for the legislature to have enacted Code, Art. 53, § 40. See note 2 *supra*. If the legislature deems it advisable to extend the prohibition against exculpatory clauses to agreements other than landlords and tenants, it is, of course, free to do so.

## VI

Winterstein contends that the releases executed "did not conclusively establish the voluntary assumption of risk in which there was an intentional and unreasonable exposure to danger which the plaintiffs-appellants knew or had reason to know as a matter of law." This point was not presented, tried and decided below. Rule 1085. In any event the premise of the contention is faulty because the rule of law on which Winterstein relies is not invoked in the factual posture of the case before us. Winterstein relies on the statement in *Powers v. State,* 178 Md. 23, 31: "The test in determining voluntary assumption of risk is whether there was an intentional and unreasonable exposure to danger which the plaintiff either knew or had reason to know." That rule deals with implied acceptance of risk, the basis which is not contract but consent. There can be no valid implied and voluntary consent to assume a risk without the knowledge of the risk. See Prosser, *supra,* pp. 459-469.[5] But here

---

5. Prosser says, at 459: "Although it was said in early decisions, and is still repeated by some courts, that assumption of risk will not be found apart from a contract relation between the parties, it is now generally recognized that the basis of the defense is not contract but consent, and that it is available in many cases where no agreement exists."

there was an express agreement admittedly executed by each of Roland Winterstein and Barbara Winterstein. We have found that the release was not void as against public policy and it is not claimed to be otherwise invalid. In it Winterstein not only acknowledged the risks and dangers involved and recognized that unanticipated and unexpected dangers might arise but expressly released Wilcom "from all claims, demands, actions and causes of action of any sort, for injuries sustained by my person and/or property during my presence in said premises and participation in the stated activities due to negligence or any other fault." This exculpatory language is thorough and comprehensive. It encompassed the claim, demand and action here and effectively released Wilcom. The intent of the parties was expressed in clear and unequivocal terms. The document anticipated the alleged negligence of Wilcom and held him harmless. The contention is without merit.

We observe that any joint claim for loss of consortium necessarily falls as dependent upon the avoidance of the releases.

*Judgment affirmed with costs.*