**J. ARON AND COMPANY, INC. to its own use and to the use of the Home Insurance Company, Plaintiff,**

v.

**SERVICE TRANSPORTATION COMPANY, Defendant and Third-Party Plaintiff,**

v.

**FIREMAN'S FUND OF AMERICA, INC. and Paul Arnold Associates, Inc., Third-Party Defendants.**

**Civ. No. B–77–1542.**

United States District Court, D. Maryland.

Feb. 4, 1980.

---

1072

Francis J. Gorman, James W. Bartlett, III and Semmes, Bowen & Semmes, Baltimore, Md., for plaintiff.

Joshua R. Treem, Steven A. Allen, and Weinberg & Green, Baltimore, Md., for defendant and third-party plaintiff.

Donald L. Merriman and Merriman, Crowther & Merriman, Baltimore, Md., for third-party defendant Fireman's Fund.

Louis G. Close, Jr. and Whiteford, Taylor, Preston, Trimble & Johnston, Baltimore, Md., for third-party defendant Paul Arnold Associates, Inc.

## MEMORANDUM AND ORDER

BLAIR, District Judge.

Early in the morning of June 29, 1977, Service Transportation's truck terminal warehouse burned to the ground. This is a diversity action brought by J. Aron & Company, Inc., the owner of a large shipment of coffee which was destroyed or seriously damaged in the fire. The plaintiff alleges that the defendant breached its duty as warehouseman/bailee. The defendant has counterclaimed for storage charges accruing after the fire. Additionally, the defendant has impleaded Fireman's Fund, its insurance carrier. The case was tried to the court. The following represent the court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a), although not specifically so designated.

The relevant facts are quite simple and almost undisputed. The plaintiff is a Louisiana corporation in the business of importing coffee, with its principal place of business in New Orleans. The defendant is a New Jersey corporation, an I.C.C.–licensed motor carrier, with a place of business in Baltimore. The amount in controversy exceeds $10,000. (Undisputed). It follows that jurisdiction is proper under 28 U.S.C. § 1332.

In June 1977, Service Transportation received 1,000 bags of the plaintiff's coffee, in good condition and invoiced at $442,378.15. (Undisputed). The coffee was held at the defendant's Baltimore terminal pending release by the Food and Drug Administration. (Testimony of Hotstream; Plaintiff's Exhibits 30–36). By letter of June 23, 1977, Service Transportation notified J. Aron & Company, Inc. that it was holding the coffee "at the risk of the owner"[1] and "as warehouseman only" and that storage charges would be assessed. (Plaintiff's Exhibit 14). The defendant stored the coffee in four trailers backed up against the doors of its terminal. The coffee was severely damaged by a fire of unknown origin which occurred on June 29, 1977. (Undisputed).

■ Thus the plaintiff proved the three elements necessary and sufficient to establish a prima facie case for recovery: delivery of its goods to the defendant, bailment for hire, and the defendant's failure to return the property in the condition in which it was received.[2] *Trans-System Service, Inc. v. Keener*, 249 Md. 369, 239 A.2d 897, 898 (1968); *Fox Chevrolet Sales, Inc. v. Middleton*, 203 Md. 158, 99 A.2d 731, 732 (1953); *Security Storage & Trust Co. v. Denys*, 119 Md. 330, 86 A. 613, 616 (1913).[3]

■ The burden then shifted to the defendant to come forward and present evidence of non-liability, evidence either excusing its failure to return the bailed goods or evidence tending to show that it exercised due care in safeguarding the plaintiff's property. *Trans-System, supra,* 239 A.2d at 898; *Stehle Equipment Co., Inc. v. Alpha Constr. & Dev. Co.*, 247 Md. 210, 230 A.2d 654, 655 (1967); *Freter v. Embassy Moving & Storage Co., Inc.*, 218 Md. 12, 145 A.2d 442, 444 (1958); *Fox Chevrolet, supra,* 99 A.2d at 732; *Chas. J. Miller, Inc. v. McClung-Logan*, 40 Md.App. 585, 588, 392 A.2d 1153 (Ct.Spec.App.1978). The Maryland version of the Uniform Commercial Code, Md.Ann.Code, Comm.L.Article § 7–403(1)(b)[4] is not to the contrary. The code places the ultimate burden of proof upon the owner of the bailed goods, but this burden does not even arise until the warehouseman or bailee[5] establishes some evidence which would legally excuse non-delivery. Once the bailee articulates a legally sufficient excuse, a question for the trier of

---

**1.** Service's assertion that it was holding the coffee at the risk of the owner is contrary to Maryland case law, the Uniform Commercial Code as enacted in Maryland and to the Uniform Bill of Lading subject to which Service shipped and stored the goods. This court gives no effect to this term, holding rather that Service, by storing the coffee for hire, exposed itself to liability as a warehouseman. *See, e. g.,* 5 M.L.E. Contracts § 101 and the cases cited therein; *Winterstein v. Wilcom*, 16 Md.App. 130, 293 A.2d 821, 824 (Ct.Spec.App.1972).

**2.** The plaintiff proved as well the amount of its actual loss, including the reasonable costs of surveying the damage and attempting to salvage some of the coffee. This court's findings with respect to damages are set out *infra* at p. 1077.

**3.** It is agreed that under *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and *Klaxon Co. v. Stentor Elec. Mfg.*

*Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), Maryland's law of bailment controls.

**4.** "The bailee must deliver the goods to a person entitled under the document who complied with subsections (2) and (3), unless and to the extent that the bailee establishes any of the following: . . .

(b) Damage to or delay, loss or destruction of the goods for which the bailee is not liable, *but the burden of establishing negligence in such cases is on the person entitled under the document*,"

(emphasis added). The italicized language is optional, and has been adopted in only about one third of the states.

**5.** The terms "warehouseman" and "bailee" are used interchangeably. *See Security Storage, supra,* 86 A. at 616; 22 M.L.E. Warehousemen § 3 (1962).

fact is presented, and the bailor must proceed affirmatively to demonstrate negligence.[6] *Compare Fox Chevrolet, supra*, 99 A.2d at 732–33:

> The burden of proving negligence never shifts from the plaintiff. He must prove the delivery, the bailment and the failure to return; thereupon it is incumbent upon the bailee to explain the failure. If he does so, the bailor must prove that the bailee failed to use ordinary care and diligence to safeguard such property and that his failure to perform that duty caused the loss.

In recognition of its burden, Service Transportation adduced the following evidence: that the fire was of unknown and possibly suspicious origin (testimony of Langan, Baccini, Cornell); that there was no history of fires in the neighborhood and that its building had never burned (testimony of Miller, Strobel); that there was greater danger of theft than of fire, and that as precaution against theft, Service had backed the coffee-laden trailers close against the terminal doors (deposition of Powell, testimony of Strobel) and equipped the terminal with a very sensitive ADT burglar alarm system (deposition of Powell, testimony of Husey, Meckel); that the building was locked on the night of the fire; that Service generally provided overnight transfer service, with the result that goods were only very rarely stored on the dock overnight; and that the premises were attended from approximately 4:00 a. m. until 1:00 a. m. every day (testimony of Miller, Gange).

■ If this were a jury trial, the court would have to determine at this point whether the defendant bailee had articulated sufficient evidence of excuse or due care to warrant sending the case to the jury. The court is of the opinion that the defendant probably did not make a sufficient showing of nonliability. *Compare*, for example, the case of *Trans-System Service, Inc. v. Keener, supra*, 239 A.2d at 898, in which a tractor stored on the defendant's premises was destroyed by fire. The defendant, in support of its burden of explaining the loss, proved (1) that the tractor was stored enclosed in a yard protected by a seven-foot chain link and barbed wire fence; (2) entrance to the lot was by means of a sliding gate; (3) the tractor was parked on the rear of the lot, two to two and a half feet from the fence; (4) the distributor cap had been removed from the tractor and it had not been started for many months; (5) no flammable materials were allowed on the lot near the tractor; (6) there was no prior record of vandalism on the premises; (7) the lot was well-lighted at all times; (8) there were employees on duty 24 hours a day, seven days a week; (9) the defendant had never before suffered a fire on its premises; (10) the cause of the fire was unknown; and (11) that, on discovering the tractor on fire, defendant's employee immediately tried to put it out with a fire extinguisher and called the Fire Department. This evidence was held sufficient to overcome the plaintiff's prima facie case, *id.*, 239 A.2d at 899.

In the instant case, Service offered no evidence, for example, that the warehouse was attended by responsible employees at the time of the fire, no evidence that there were no flammable materials stored on the premises, and no evidence of any precautions taken to prevent fire by the last employee to leave on the night of the fire. (The employee, one Fisher, is presumed to have left the terminal at approximately 1:00–1:15 a. m. The fire broke out sometime before 2:00 a. m. (Powell deposition). Fisher was not called as a witness.) Nevertheless, since the court sat as the trier of fact, the court has assumed that the bailee's showing was sufficient, and required the plaintiff to prove affirmatively the bailee's negligence.

To this end, J. Aron proved the following facts: the Service Transportation terminal building was neither fireproof nor fire resistant. (Undisputed). It had masonry walls, a pitched, wood-trussed roof con-

---

**6.** The necessity of showing negligence is because the bailee is not an insurer of the safety of property entrusted to its care. *Trans-System, supra*, 239 A.2d at 898.

structed of tarpaper and asphalt shingles, and seven wooden garage-type doors running down either side of the storage area, against which trailers were backed. (Undisputed). The building was described by one expert as "combustible," and is classified under the Baltimore City Building Code as "ordinary." (Testimony of Baccini, Peters). There was no fire alarm, smoke detection or fire abatement system on the premises. *Cf.* Baltimore City Building Code § 4871, 4888. There was no round-the-clock guard service: in fact, the premises were routinely left unattended between 1:00 and 4:00 a. m. (Undisputed). The fire originated in the office area and within 30 to 40 minutes spread the entire length of the warehouse, engaging the roof and spreading to the trailers containing the plaintiff's coffee.

Finally, the plaintiff proved that, in violation of the Baltimore City Fire Code, there were stored on the premises on the night of the fire five 55-gallon drums of a "Class II" flammable liquid called Kure-n-Seal and five 55-gallon drums of a "Class I" flammable liquid printer's ink.[7] The flash point of the two liquids is 108 ° and 25 ° fahrenheit respectively. (Undisputed).[8] The drums were stored near the middle of the dock, approximately opposite the doors at which the trailers containing J. Aron's coffee were parked. The Class II liquid had been stored on the Service Transportation premises for several weeks prior to June 29. (Testimony of Strobel; Plaintiff's Exhibit 181). Service handled flammable printer's ink every day. Usually the ink drums stayed on the dock only a few hours. On the night of the fire and perhaps on other occasions as well, the drums were left overnight. (Testimony of Strobel).

In the absence of the "highly hazardous room" required by the City code,[9] acceptable alternatives where flammable liquid must be stored include sprinkler systems, buried vaults, water deluge systems, remote storage areas forty feet or more away from occupied structures and dry chemicals. (Testimony of Peters). Service Transportation had none of these. The minimum safety precaution which might pass muster where flammable liquids are occasionally handled for short periods of time would be to store the liquids in an empty locked trailer, away from the warehouse proper. (Testimony of Peters, Griffitts). Again, Service did not store the drums away from its combustible building or away from the combustible and highly valuable cargo of coffee. Service did not even take the very slightest precaution available, that is, to store the flammables at the far end of the terminal against a masonry wall and away from the office and the coffee. (Testimony of Griffitts, Peters, Baccini). There was evidence that other companies in the area, when forced to store flammable liquids for a short time, store them either in a remote trailer or at the extreme end of the terminal building. (Testimony of Spindler, Allred, Miller).

Under Maryland law, it is well-settled that mere violation of a statute does not constitute negligence *per se* unless the violation was the proximate cause of the injury. *Dean v. Redmiles*, 280 Md. 137, 374 A.2d 329, 342 (1977); *Hopper, McGaw & Co.*

7. The Baltimore City Fire and Building Codes applicable to commercial buildings provide that no quantities of flammable liquids in excess of ten gallons of Class I liquid or 55 gallons of Class II liquid may be stored inside any building without a permit. They provide further that no such permit shall issue where amounts of Class I liquids over 65 gallons or of Class II liquids over 600 gallons are not stored in a "highly hazardous room" as described in the Building Code. (Testimony of Griffitts, Peters). (Baltimore City Fire Code § 26.8). Service stored, on the night of the fire, over 65 gallons of Class I liquid (the printer's ink) but under 600 gallons of Kure-n-Seal, the Class II liquid. Service, an "ordinary" building, had no highly hazardous room and, indeed, no permit. (Undisputed).

8. The flash point is the minimum temperature at which a liquid gives off flammable vapors which, in contact with spark or flame, will ignite. 49 C.F.R. § 171.8. The lower the flash point, therefore, the greater the hazard of explosion or fire. (Testimony of Griffitts, Baccini).

9. Baltimore City Building Code §§ 4701, 4868. *See* footnote 7, *supra*.

*v. Kelly*, 145 Md. 161, 125 A. 779, 781 (1924); *Kelly v. Huber Baking Co.*, 145 Md. 321, 125 A. 782, 787–88 (1924). This court finds as a fact that the 550 gallons of flammable liquids stored on the dock on June 29, 1977 contributed to the spread of the fire to the trailers and to the coffee contained in them.

■ The defendant sought to rebut the plaintiff's case by showing that it was common practice in the local trucking industry to store small quantities of flammable liquids temporarily. Neither witness who testified concerning the practice in the industry, however, stated that his firm handled flammable liquids in the manner Service Transportation did. Mr. Spindler, who worked for Roadway Express, testified that his company hired a guard when the terminal was unattended, and that when they had flammable liquids, they told the supervisor who then directed that the materials be stored either in an empty trailer or at the far end of the terminal. Mr. Miller, who had worked for Helms Express, East Texas Motor Freight and Ryder, testified that while theft was generally a matter of greater concern than fire, his employers generally sought to keep flammables away from the office and heating system and that company policy would require guarding a valuable cargo like coffee around-the-clock. This court concludes from all the evidence presented that Service Transportation failed to demonstrate ordinary care and diligence under the circumstances and thus failed to rebut J. Aron's affirmative showing of negligence. Accordingly, judgment will be entered for the plaintiff.

### Related Claims

■ The defendant filed a compulsory counterclaim under Fed.R.Civ.P. 13(a) for $8,909.25, the amount of storage charges accruing after the fire, while the coffee remained on Service's premises prior to shipment to S. A. Wald & Co., Inc. in New Jersey for reconditioning. There is no dispute that the amount is correct or that the charges are in fact due and owing. (Pretrial Order at 7). Accordingly, judgment

by way of recoupment [10] will be entered for the defendant and the plaintiff's recovery reduced by so much.

■ The court reserved ruling on the motion of the third-party defendant, Fireman's Fund, to dismiss. The motion will be granted. This court earlier determined in a related case that Service Transportation's Fireman's Fund insurance policy covered only loss to goods "in the ordinary course of transit" and not loss to the coffee while it was held at the terminal. *Fireman's Fund Ins. Co. v. Service Transportation Co.*, 466 F.Supp. 934, 937 (D.Md.1979). Service has subsequently asserted that in the event it is found liable for any loss of coffee occurring after the fire, it is covered by the Fireman's Fund policy.

Having heard all the evidence, this court finds and concludes that if there were any post-fire loss, it occurred by reason of vandalism or pilferage on the Service premises and not while the coffee was "in the ordinary course of transit." Accordingly, by its terms, the Fireman's Fund policy at issue does not cover the loss, and Fireman's Fund's motion to dismiss the third-party complaint must be granted.

Finally, J. Aron & Co., Inc. filed a claim under Fed.R.Civ.P. 14(a) against Fireman's Fund based on the I.C.C. endorsement attached to Service's insurance policy. By Memorandum and Order of December 7, 1979, this court denied Fireman's Fund's motion to strike the claim or, in the alternative, motion for summary judgment. The court found that the I.C.C.-mandated endorsement created a limited duty running from insurance carriers to members of the shipping public, regardless of limitations contained in the contract of insurance between the company and its insured.

■ The law requires insurance companies to compensate shippers or consignees for loss or damage to their property which has come "into the possession of [a motor] carrier in connection with its transportation service." 49 U.S.C. § 10927; 49 C.F.R.

---

**10.** *See* 6 Wright & Miller, *Federal Practice and Procedure*: ·Civil § 1401.

§ 1043.1. This court finds that although the coffee had come to rest at Service's terminal on June 29, 1977 and was no longer "in the ordinary course of transit," Service's undertaking to store the coffee was "in connection with" its transportation service. Thus, the I.C.C. regulation and endorsement made pursuant thereto apply.

The exposure of the insurance carrier under the endorsement is contingent upon the liability of the insured, 49 U.S.C. § 10927, and limited as to amount. 49 C.F.R. § 1043.2. The endorsement which is at issue here (form BMC 32; Exhibit 1 to Court Paper # 4 in Civil No. B–77–2003) provided for maximum liability of $5,000. This form was obsolete on the date on which the parties entered the contract. The correct figure was $10,000. 49 C.F.R. § 1043.2(b).[11] Since the endorsement is attached only for the purpose of assuring compliance with the federal regulation, this court will give effect to the correct amount, that is, $10,000.[12] Accordingly, the court having established the liability of the insured and having determined the applicable amount, the plaintiff may recover $10,000 of its claim against Service Transportation from Fireman's Fund.

### Damages

There remains only the assessment of the plaintiff's damages. The parties agree that the price per pound of green Nicaraguan coffee was $2.67 on the date of the fire. Based upon an estimated net weight per bag of coffee of 152.076 lbs. (Plaintiff's Exhibit 3), the court finds the plaintiff's damages to be as follows:

| | |
|---|---:|
| Total value of coffee on 6/29/77 (1,000 bags nt. wt. ea. 152.076 at $2.67/lb.) | $406,042.92 |
| Salvage expenses: | |
| S. A. Wald & Co., Inc. | 19,071.01 |
| Belt's Wharf Whse., Inc. | 849.34 |
| Peter F. Luard & Co., Inc., Surveyors | 1,797.50 |
| Freight (Baltimore to S. A. Wald & Co., Inc. in New Jersey) | 1,159.09 |
| FDA charges: supervision of disposal of unsalvageable coffee. | 122.75 |
| | $429,042.61 |
| Less: Salvage proceeds to plaintiff | 40,426.75 |
| Storage charges, the subject of defendant's counterclaim | 8,909.25 |
| | 49,336.00 |
| Total Damages [13] | $379,706.61 |

Accordingly, it is this 4th day of February, 1980, by the United States District Court for the District of Maryland, hereby ORDERED:

1. That the Clerk enter judgment as provided by Fed.R.Civ.P. 58 for the plaintiff in the amount of $379,706.61, with costs, an amount which reflects the amount of recoupment allowed to the defendant on its counterclaim.

2. That the third-party defendant's motion to dismiss the third-party complaint of Service Transportation Company be, and the same hereby is, GRANTED.

3. That the court finds the correct limit of Fireman's Fund's exposure pursuant to 49 U.S.C. § 10927, 49 C.F.R. § 1043.2(b) and the endorsement to the operative insurance policy to be $10,000.

---

11. The Code of Federal Regulations provided for maximum liability under this provision of $5,000 through 1975. From 1976 to the present, the maximum applicable ceiling has been $10,000. The contract of insurance to which the I.C.C. endorsement is attached is dated May 1, 1977.

12. Liability is limited to $5,000 for damage to property on any one motor vehicle, and to $10,000 for losses occurring at any one time and place. 49 C.F.R. § 1043.2(b). Since more than one vehicle was involved, but the loss was suffered all at once, the higher figure applies.

13. The plaintiff sought to recover the ocean and motor freight charge accrued in shipping the coffee from Nicaragua to Baltimore. This court finds that such expenses were in no way occasioned by the fire and are not properly included in the measure of damages.