514 A.2d 485

**Daniel M. BOUCHER**

v.

**Gordon E. RINER, et al.**

**No. 1470, Sept. Term, 1985.**

Court of Special Appeals of Maryland.

Sept. 8, 1986.

David R. Thompson (Kurt D. Karsten and Franch, Earnest & Cowdrey, P.A. on brief), Easton for appellant.

W. Michael Jacobs (Charles E. Iliff, Jr. and Semmes, Bowen & Semmes on brief), Baltimore for appellees.

Before WEANT, KARWACKI and WENNER, JJ.

KARWACKI, Judge.

Daniel M. Boucher, the appellant, wishing to learn how to parachute, joined the Naval Academy Parachuting Club (the Club) in September 1982. The Club is a voluntary extracurricular activity for students at the Naval Academy. The Academy, where Boucher was a midshipman, provided equipment, paid various fees, and made arrangements for the use of a drop zone for the club members. Although the Club was organized and operated by upperclass midshipmen, it had a faculty advisor, and the Club members were accompanied on field trips by naval officers.

The Club had an agreement with Parachutes Are Fun, Inc. (Parachutes), for the use of Parachutes' drop zone as a training ground for Club members. That agreement provided that the Club would provide its own equipment and be able to use the drop zone at a reduced rate. Parachutes agreed to conform to all regulations as specified by the Academy.

Prior to Boucher's first parachute jump, he received instructions in sport parachuting at the Academy from

Midshipmen Byrne and Lastar, who were among the upper-classmen who ran the Club. The two were qualified by the U.S. Parachute Association (USPA), a civilian organization engaged in the promotion and self-regulation of the sport. Boucher's training consisted of instruction in the hazards normally associated with parachuting, including the hazard posed by jumping in the vicinity of uninsulated electric power lines. Attention was given to the methods which should be employed by the parachutist to avoid or minimize contact with obstacles on the ground by controlling the direction of descent.

The appellees, in addition to Parachutes, are: the Pelican-land Corporation (Pelicanland), the owner of the airport where the drop area was located; Gordon E. Riner, the co-owner and vice-president of Parachutes, who is a certi-fied jumpmaster, instructor, and parachutist; and Kenneth Dunker, a certified jumpmaster, instructor, and parachutist who worked at Parachutes.

On September 18, 1982, Boucher along with other mid-shipmen went to Pelicanland to make his first jump. Prior to Boucher's boarding the airplane that day, he signed an exculpatory agreement with Parachutes, the relevant por-tion of which stated:

2 A. EXEMPTION FROM LIABILITY

The Participant exempts and releases the Corporation, its owners, officers, agents, servants, employees, and lessors and the County of Sussex, its officers, agents, servants and employees from any and all liability, claims, demands or actions or causes of action whatsoever aris-ing out of any damage, loss or injury to the Participant or the Participant's property while upon the premises or aircraft of the Corporation or while participating in any of the activities contemplated by this Agreement, whether such loss, damage, or injury results from the negligence of the Corporation, its officers, agents, servants, employ-ees or lessors or from some other cause.

At about 5:30 p.m., a decision was made that wind conditions were such that the jump could be made. Boucher went up in the plane with two other midshipmen and with Riner, who was there to act as coach and jumpmaster. Dunker was on the ground, near the target area, and was manning the public address system to "talk down" the jumpers. Boucher was the last of the three to jump. After Boucher's parachute opened, Dunker began calling out his instructions, telling Boucher to change from a "running" position where his back was to the wind, to a "holding" position, facing the wind. As Boucher neared the ground, Dunker instructed him to execute a 360° turn. At this point, Dunker realized that there was a danger that Boucher would fly right into nearby power lines. He gave no indication of that danger to Boucher, who continued his descent with his back to the lines. Seconds later, Boucher collided with the lines, sending 12,500 volts of electricity through his body.

Boucher filed a two count declaration against the appellees alleging (1) negligence on the part of the appellees as owners or occupiers of the drop zone, because of the location of the electric lines in relation to the drop zone, and (2) gross negligence on the part of the appellees in the performance of their duties. The appellees jointly moved for summary judgments. On July 24, 1985, following a hearing, the Circuit Court for Caroline County (Rasin, J.), in a well reasoned memorandum opinion, granted the appellees' motion. Boucher, in his appeal from those judgments, presents the broad question of "whether the trial court improperly granted summary judgment to the defendants?" Specifically, he raises the following issues:

I. Whether the evidence presented a genuine issue of fact as to the defendants' gross negligence?

II. Whether the exculpatory agreement signed by the plaintiff shortly before the accident precluded all recovery against the defendants based on negligence?

III. Whether there exists a genuine issue of fact as to the defendant Dunker's status as an independent contractor?

■ Preliminarily, since the hearing court resolved this controversy in favor of the appellees by summary judgment, we will review the evidence, including all permissible inferences therefrom, in the light most favorable to the appellant. *Natural Design, Inc. v. Rouse Co.*, 302 Md. 47, 62, 485 A.2d 663 (1984); *Washington Homes v. Inter. Land Dev.*, 281 Md. 712, 716–18, 382 A.2d 555 (1978). Summary judgment should be granted only upon a showing that there is no genuine issue as to any material fact. *Fireman's Fund Ins. Co. v. Rairigh*, 59 Md.App. 305, 313, 475 A.2d 509, *cert. denied*, 301 Md. 176, 482 A.2d 502 (1984). If there is a conflict between the inferences which may be drawn from the evidence before the court, summary judgment is not proper. *Coffey v. Derby Steel Co.*, 291 Md. 241, 246–47, 434 A.2d 564 (1981). Our review of all of the evidence in the light most favorable to the appellant convinces us that the hearing court was correct in finding, that there was no genuine dispute as to any material fact and that the appellees were entitled to judgments as a matter of law.

## I.

■ Boucher contends that the appellees were guilty of gross negligence and that even if the exculpatory clause is held to be valid it does not shield the appellees from liability for gross negligence. As to the latter part of Boucher's assertion—that the appellees are not shielded from liability for gross negligence—he is correct. A waiver of a right to sue, such as the one executed between Boucher and Parachutes, is ineffective to shift the risk of a party's own willful, wanton, reckless, or gross conduct. *Winterstein v. Wilcom*, 16 Md.App. 130, 134–36, 293 A.2d 821, *cert. denied*, 266 Md. 744 (1972). Dean Prosser explains such a result on the alternative bases of common experience as to what is intended by the contracting parties or of public

policy to discourage aggravated wrongs. Prosser and Keeton, *The Law of Torts* § 68 (5th ed. 1984).

Returning to the first part of Boucher's contention—that the appellees were guilty of gross negligence—we find ourselves in agreement with the hearing court that Boucher fails in his reliance on essentially three facts to raise an inference of gross negligence. Boucher alleges that the appellee Dunker was on the ground giving instructions to Boucher as he was descending; that Boucher was unaware of the electric lines prior to colliding with them because, as Dunker had instructed, his back was to the lines; and that Dunker did not warn Boucher of the presence of the power lines. Boucher argues that an inference of gross negligence can be drawn from the above circumstances because Dunker was "controlling" Boucher's movements and thus guided Boucher into the electric lines.

Gross negligence has been examined in a number of Maryland cases dealing with a variety of issues. These cases have addressed issues which include the circumstances under which gross negligence can support an award of exemplary damages,[1] civil liability for injuries to trespassers,[2] and criminal liability for manslaughter by automobile.[3] Our appellate courts have also dealt with the issue of gross negligence in the context of the type of conduct that would support an inference sufficient to overcome the bar of an

---

1. *Smith v. Gray Concrete Pipe Co.*, 267 Md. 149, 297 A.2d 721 (1972); *Bannon v. B. & O. R.R. Co.*, 24 Md. 108 (1866).

2. *Murphy v. Baltimore Gas & Elec.*, 290 Md. 186, 428 A.2d 459 (1981); *Mondshour v. Moore*, 261 A.2d 482, 256 Md. 617 (1970); *Mech v. Hearst Corp.*, 64 Md.App. 422, 496 A.2d 1099 (1985), *cert. denied*, 305 Md. 175, 501 A.2d 1323 (1986); *Medina v. Meilhammer*, 62 Md.App. 239, 489 A.2d 35, *cert. denied*, 303 Md. 683, 496 A.2d 683 (1985).

3. *Johnson v. State*, 213 Md. 527, 132 A.2d 853 (1957).

automobile guest statute,[4] contributory negligence,[5] and, as in this case, a pre-injury release.[6]

In *Smith v. Gray Concrete Pipe Co.*, 267 Md. 149, 297 A.2d 721 (1972), the Court of Appeals addressed the issue of gross negligence in the context of punitive damages. In that case, a boy was killed after he was struck by a truck owned by the defendant concrete company and driven by an inexperienced 18 year-old. In an action seeking compensatory and exemplary damages, the executor of the decedent's estate sued Gray Concrete for negligent entrustment of the vehicle and the driver for negligent operation of the truck. The complaint stated that the corporate defendant had entrusted the truck to the driver knowing that the truck's hood was improperly secured and that it could pop open at any time, that the driver was only 18 when the law required its drivers to be over 21 years of age, that the driver had no chauffeur's license, and that the driver was untrained, unqualified, and incompetent to drive the truck on the highway. *Id.* at 169, 297 A.2d 721. The count against the driver alleged that he did not check the condition of the truck prior to operating it on the highway, that he did not respond properly when the hood flew up and blocked his vision—he stopped his truck in the center lane of the highway rather than pulling it off to the side—and that he knew or should have known that the truck was in violation of many requirements of the law. *Id.* at 170–71, 297 A.2d 721.

The Court concluded that punitive damages were recoverable in actions arising out of motor vehicle torts where there was a " 'wanton or reckless disregard for human life' in the operation of a motor vehicle, with all the known dangers and risks attendant to such conduct." *Id.* at 168, 297 A.2d 721. The Court stated that the standard contemplated conduct which was of an "extraordinary or out-

---

4. *Romanesk v. Rose,* 248 Md. 420, 237 A.2d 12 (1968).

5. *Liscombe v. Potomac Edison Co.,* 303 Md. 619, 495 A.2d 838 (1985).

6. *Winterstein v. Wilcom,* 16 Md.App. 130, 293 A.2d 821, *cert. denied,* 266 Md. 744 (1972).

rageous character," but which stopped short of "wilful or intentional injury." *Id.*

In *Smith*, the Court held that punitive damages were not recoverable against the driver of the truck because his conduct, "although constituting sufficient negligence to support a claim for compensatory damages, does not mount up to 'a wanton or reckless disregard for human life.'" *Id.* at 171, 297 A.2d 721. In other words, although the driver may have exercised extremely poor judgment in his operation of the truck, his conduct was not of an extraordinary or outrageous character so as to constitute gross negligence.

On the other hand, the corporate defendant was found to be subject to possible exemplary damages. The conduct of Gray Concrete "did not occur under the pressures of a highway crisis, where what might superficially appear to be caused by 'extraordinary or outrageous conduct' could be merely the result of poor judgment exercised under such circumstances." *Id.* at 172, 297 A.2d 721. The Court noted that Gray's conduct reflected a premeditated decision by an employer in possession of facts which should have indicated almost certain harm to others. *Id.*

In another instructive case, *Liscombe v. Potomac Edison Co.*, 303 Md. 619, 495 A.2d 838 (1985), the Court of Appeals had to determine whether there had been a showing of legally sufficient evidence of gross negligence to defeat the defendants' motions for summary judgment. *Liscombe* involved the driver of a dump truck who was injured when the raised bed of his truck came into contact with high voltage lines that passed over the site. The driver alleged that the gross negligence of both the power company and the occupier of the premises led to his being injured. *Id.* The Court quoted from *Bannon v. B. & O. R.R. Co.*, 24 Md. 108, 124 (1866), where it was said: "Gross negligence is a technical term, it is the omission of that care 'which even inattentive and thoughtless men never fail to take of their own property,' it is a violation of good faith." *Id.*, 303 Md. at 634–35, 495 A.2d 838. The Court then noted its decision in *Romanesk v. Rose*, 248 Md. 420, 237 A.2d 12 (1968)

(applying Virginia law), in which it quoted with approval the definition of gross negligence from 4 Blashfield, *Cyclopedia of Automobile Law and Practice* § 2771 (1946 ed.) as:

an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them. Stated conversely, a wrongdoer is guilty of gross negligence or acts wantonly and willfully only when he inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist.

*Id.* at 423, 237 A.2d 12.

In concluding that the evidence of gross negligence before the hearing court was insufficient, the Court assumed without deciding that the "lesser standard" of *Smith v. Gray Concrete Pipe Co., supra,* was the appropriate test for determining whether legally sufficient evidence of gross negligence by either defendant had been shown. The *Liscombe* Court noted the defendants' efforts to minimize exposure to the danger, that there was no evidence of indifference by the defendants to the safety of others, and that there was no indication to either that almost certain harm to others would result from the defendants' action or their failure to act. The Court stated that, "[t]here was, in short, no showing of facts establishing extraordinary or outrageous conduct mounting up to a wanton or reckless disregard for human life on the part of either defendant." *Id.*

■ We rely on the guidance of *Liscombe* and *Smith* in deciding whether the conduct of the appellee Dunker in this case amounted to gross negligence. In *Smith*, the Court of Appeals noted that "the conduct alleged here reflects a premeditated decision, deliberately arrived at, by an indifferent employer in possession of facts which should have indicated almost certain harm to others." 267 Md. at 172, 297 A.2d 721. In the case *sub judice*, viewing all of the evidence in the light most favorable to the appellant, we

cannot say that Dunker's conduct amounted to a wanton or reckless disregard for Boucher's life. The undisputed material facts of this case show that Dunker was attentive to Boucher's descent, that he was stationed in the proper location, and that he was calling out instructions to Boucher as was expected of him. There was no showing of indifference on the part of Dunker. Rather, the conduct alleged here reflects, at worst, poor judgment on the part of Dunker that, while perhaps amounting to ordinary negligence, does not rise to the level of gross negligence. We see no evidence of a premeditated decision, deliberately arrived at, by an indifferent jumpmaster that should have indicated almost certain harm to others.

## II.

The appellant next argues that the exculpatory agreement which he signed shortly before his jump is unenforceable.[7] We disagree.

The Maryland law regarding exculpatory clauses can be stated quite succinctly. In the absence of legislation to the contrary, there is ordinarily no public policy which prevents the parties from contracting as they see fit. *Winterstein v. Wilcom,* 16 Md.App. at 135, 293 A.2d 821. "It is quite possible for the parties expressly to agree in advance that the defendant is under no obligation of care for the benefit of the plaintiff, and shall not be liable for the consequences of conduct which would otherwise be negligent." *Id.,* quoting Prosser, *The Law of Torts* § 67 (3d ed. 1964). There are, of course, exceptions to the general rule, and the appellant would have us here find either of two exceptions applicable. The first is that such an agreement will be invalid if the relationship of the parties is such that one

---

**7.** Whether this issue is even preserved for our review is questionable since it was not explicitly raised below. On the assumption that it was implicitly preserved for our review, however, we will address the issue.

party is at an obvious disadvantage in bargaining at the time the contract is entered so that the effect of the contract is to put him at the mercy of the other's negligence. *Winterstein,* 16 Md.App. at 135–36, 293 A.2d 821. The second exception invalidates exculpatory agreements if they are part of a transaction affected with a public interest. *Id.* at 136–37, 293 A.2d 821. We will examine the exculpatory agreement *sub judice,* in light of the evidence before the hearing court to determine the applicability of either exception.

■ Boucher joined the Club of his own volition sometime prior to September 18, 1982. His participation in the Club was not required by the Academy. Further, Boucher was not compelled by Parachutes to agree to the waiver of his right to sue. Had Boucher so wished, he could have chosen the option provided by Parachutes under Paragraph 2B [8] of the Agreement to pay an additional fee of $300 to nullify the waiver of paragraph 2A. Boucher chose not to pay the additional fee thereby waiving his right to sue in the event of an accident involving the negligence of the defendants.

The case of *Winterstein v. Wilcom, supra,* involved an exculpatory contract with language similar to the instant Agreement. In *Winterstein,* the appellant had signed an exculpatory agreement in connection with his use of a drag strip operated by the defendant. The plaintiff was injured when his car struck an automobile cylinder head which had not been cleared from the track prior to the plaintiff's use of the drag strip. *Winterstein,* 16 Md.App. at 133, 293 A.2d 821. This Court held that the exculpatory agreement

---

**8.** 2B ALTERNATIVE PROVISION:

In consideration of the deletion of the provisions, 2A, 3, 4 and 6 herein regarding EXEMPTION FROM LIABILITY COVENANT NOT TO SUE, INDEMNITY AGAINST THIRD PARTY CLAIMS, and CONTINUATION OF OBLIGATION the Participant has paid the additional sum of $300.00 upon execution of this agreement, receipt of which is hereby acknowledged by the Corporation.

was not void as against public policy. We noted there that there was "not the slightest disadvantage in bargaining power between the parties." *Id.* at 138, 293 A.2d 821. We stated that the plaintiff "was under no compulsion, economic or otherwise, to race his car. He obviously participated ... simply because he wanted to do so .... This put him in no bargaining disadvantage." *Id.* We make a similar determination in the instant case. Boucher was under no compulsion to make a parachute jump, and he did so merely because he wanted to do so. He was not at a bargaining disadvantage.

■ This Court in *Winterstein* identified six factors to be considered in determining whether a transaction is so affected by public interest as to invalidate exculpatory provisions. Quoting from a decision by the Supreme Court of California, sitting *en banc*, we stated:

[T]he attempted but invalid exemption involves a transaction which exhibits some or all of the following characteristics. It concerns a business of a type generally thought suitable for public regulation. The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. Finally, as a result of the transaction, the person or property of the purchaser

is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents.

*Winterstein,* 16 Md.App. at 137, 293 A.2d 821.

Clearly, the transaction in which the appellant engaged on September 18, 1982, exhibited none of these characteristics. Parachutes is not performing a service of great importance or a matter of practical necessity for any member of the public. The Legislature has not thought sport parachuting suitable for public regulation. As the service is not of an essential nature, Parachutes had no decisive advantage of bargaining strength against any member of the public seeking to participate. Boucher was not "under the control" of Parachutes or its employees in such a way that he was subject to the risk of carelessness by Parachutes— Boucher had received training in obstacle avoidance. Finally, Boucher was under no obligation to make the jump. *Cf. Winterstein,* 16 Md.App. at 138, 293 A.2d 821. We therefore hold that the exculpatory clause signed by Boucher was not void as against public policy.

## III.

Lastly, the appellant argues that summary judgment should not have been granted because "[t]here exists a genuine issue of fact as to whether defendant Dunker's status at Parachutes Are Fun, Inc. was that of servant or independent contractor." The short answer is that the appellant has not preserved this issue for our review. Rule 1085. In the summary judgment proceedings before the hearing court, the appellant did not attempt to contradict any of the affidavits, admissions, deposition excerpts, or any evidence presented by the appellees in support of their summary judgment motion. Furthermore, the appellant did not argue at the hearing on the motion that Dunker was an independent contractor. By failing to make this argument before the hearing judge, the appellant did not show that court, with some precision, a genuine and material dispute.

*Sherman v. Am. Bankers Life Assur.,* 264 Md. 239, 242, 285 A.2d 652 (1972).

The appellant himself conceded in his brief to this Court that the only time that the status of the appellee Dunker was raised by the appellant, up to and including the summary judgment hearing, was in the complaint he filed in the Circuit Court. In paragraph six of the complaint, the appellant alleged:

> Defendant Kenneth Dunker, on September 18, 1982, acted *as an agent* of both Parachutes Are Fun, Inc., and Pelicanland Corporation. He also acted independently in his capacity as a licensed parachute jump master. (Emphasis supplied).

To us, the above quoted paragraph appears to be an acknowledgement that the appellant recognized Dunker as an agent of Parachutes and of Pelicanland. Given that the exculpatory clause released from liability "the Corporation, its owners, officers, *agents,* servants, employees, and lessors ..." (emphasis added), the appellant's argument, without more, does not appear to have any merit. Surely the phrase "[h]e also acted independently," read in the context of the rest of paragraph six of the appellant's complaint, cannot be taken to mean that the appellant asserts that Dunker was an independent contractor. But therein lies the danger behind an appellate court attempting to review an issue that was not passed upon by the court below. In order to prevent such a situation, this Court ordinarily will not decide a question that has not been raised and decided by the lower court. Rule 1085; *Washington Homes v. Baggett,* 23 Md.App. 167, 326 A.2d 206 (1974), *cert. denied,* 273 Md. 723 (1975). The requirements of Rule 1085 are matters of basic fairness to the hearing court, and to opposing counsel, as well as being fundamental to the proper administration of justice. *Medley v. State,* 52 Md. App. 225, 448 A.2d 363, *cert. denied,* 294 Md. 544 (1982).

JUDGMENT AFFIRMED; COSTS TO BE PAID BY THE APPELLANT.