75 So.2d 306 (1954)
JACKSON GRAIN CO.
v.
HOSKINS.
Supreme Court of Florida. En Banc.
May 25, 1954.
On Rehearing October 29, 1954.
Mabry, Reaves, Carlton, Anderson, Fields & Ward, Tampa, for appellant.
Cooper & Cooper, Tampa, and Bryant & Martin, Lakeland, for appellee.
Tenney, Sherman, Bentley & Guthrie, S. Ashley Guthrie, George E. Howell, Chicago, Ill., and Green & Bryant, Ocala, for amici curiae.
THOMAS, Justice.
A trial of this controversy on its merits culminated in a verdict and a judgment for the farmer against the seedsman and this appeal followed.
The plaintiff tried to buy tomato seed from a local merchant, Stevenson Seed *307 Store, but the merchant's supply was exhausted. To meet the plaintiff's requirements the merchant ordered from the defendant fifty pounds of seed and the defendant filled the order with seed which it had secured from Haven Seed Company of Santa Ana, California, which had obtained the seed from Adrian Seed Company of Adrian, Michigan. The seed was delivered to Jackson Grain Company in a fifty-pound bag carrying the tag of Haven Seed Company. Jackson Grain Company placed the seed in one hundred packages, each containing a half-pound and bearing the lot number of Jackson Grain Company and the name of the seed and these packages were forwarded to Stevenson Seed Store. Evidently the plaintiff received the very seed which originated with Adrian Seed Company. To this point we have purposely not recorded the name of the tomato seed because to do so would likely confuse the reader when examining our analysis of the pleadings as they existed at the beginning and conclusion of the trial.
The plaintiff sowed between 14 January and 2 February 1950, and harvested between 28 April and 22 May. After the crop had been gathered and all evidence of it had been eliminated from the field plaintiff first complained to Jackson Grain Company. Suit was instituted 12 October 1950. In the complaint it was charged that the seed was mislabeled as to variety, the plaintiff having ordered "Grothen's New Red Globe tomato seed" and having received seed bearing that name, which were not "Grothen's New Red Globe tomato seed." As a consequence, according to the complaint, the plaintiff spent much money cultivating and bringing to maturity tomato plants which did not bear "Grothen's New Red Globe tomatoes" but tomatoes of another variety unknown to him, and in a marketable quantity that was only a small fraction of the crop which would have been produced had the seed been those represented.
Then the complaint was amended 13 January 1951, to include an allegation that the packages bore no label or tag "giving the name [or] kind and variety of seed" but the kind as named on each package was "false, misleading, and untrue * * *." These statements, of course, are entirely contradictory. Again the plaintiff amended, 19 March 1951, claiming the defendant negligently failed to deliver "Grothen's New Red Globe" tomato seed and negligently delivered some other variety and negligently failed to comply with Chapter 578, Florida Statutes 1949 and F.S.A.
After many amendments, answers and motions had been filed, presented and considered the case was dismissed with prejudice. The judgment was reviewed by this Court and reversed. Hoskins v. Jackson Grain Co., Fla., 63 So.2d 514. The same day there was filed the opinion in Corneli Seed Co. v. Ferguson, Fla., 64 So.2d 162. Both of these decisions should be consulted in studying the points in the present case. In substance the court held in the latter case that despite disclaimer and non-warranty clauses the seedsman would be liable for a "varietal variance" between seed ordered and seed received and planted  in that case Black Diamond watermelons and melons of another kind. In the former opinion, we held that when seed bearing a certain label are sold, and upon planting, yield a different "kind or variety" the wholesaler is liable directly to the farmer for damages that are traceable to the mislabeling. We also held that where a penal statute requiring true labeling is violated negligence of the one who mislabeled is established as a matter of law.
When this cause was returned to the circuit court for trial, voluminous testimony was taken, presumably relevant to the issues defined by the pleadings we have quoted but, it should be noted that the amendments of 19 March 1951 relative to negligence of the defendant in placing in the packages seeds that differed from the label were eliminated from consideration of the jury and inasmuch as there is no cross assignment of error this aspect will hereafter be ignored.
At the close of his testimony the plaintiff was allowed to file an amendment to his complaint for the announced purpose of making that pleading conform to the *308 proof. Substance of it was that he ordered "Grotham's Globe" tomato seed and received "Grothen's New Red Globe" which he thought were the same and which he planted "for the purpose of growing Grothen's Globe tomatoes." At first it would appear that the plaintiff was charging that the difference between "Grotham's Globe" and "Grothen's New Red Globe" proved his undoing, therefore that he had departed form the theory he had adopted when we settled the law of the case in the cited opinion. But when the amendment is considered with the remaining unamended parts of the complaint we reach a contrary view. There was evidently some confusion of the names "Grotham's Globe" and "Grothen's New Red Globe", however, it was the gist of the complaint that neither was produced but that on "strong and healthy" vines were borne a quantity of tomatoes of an unknown variety so small as to be largely unmerchantable, and that as a consequence the yield was but 4469 boxes instead of 30,000 that would have been produced had there been no varietal difference between the seed represented and the seed that produced the crop.
After a careful examination of the record, we are convinced that the plaintiff was not guilty of any departure in the theory of his case when at the conclusion of his testimony he sought and obtained the permission of the court to amend his complaint.
The more we have studied and discussed the facts revealed by this record, the more impressed we are with the idea that the testimony of the witnesses for the parties relative to variety and husbandry was so sharply in conflict that it was utterly irreconcilable and that there was sufficient proof to have supported a verdict for either party. This was an ideal situation for application of the rule that the triers of fact should settle the matter and that this Court should not interfere with the result, if, of course, it was properly reached.
The trouble here, and the reason for not invoking the rule, is that the jury decided the matter in a manner we cannot sanction. The jury found that the plaintiff should recover in the sum of $53,500. Certainly to take that much money from one person and give it to another is a major operation.
When the jurors retired to enter upon their deliberations they had been charged by the court so fairly and thoroughly that neither party now challenges the charges. Once they were in their room, a curious procedure was adopted. Each wrote on a slip the amount he thought the plaintiff should recover, that is, all did except one, and he recorded either "no" or "O". The five figures were added and then divided, not by six, but by five. Even so an error of one hundred dollars was committed. To be exact the figures set down by the individual jurors were $15,000, $40,000, $50,000, $75,000, and $87,000, while one juror wrote "no". When added the sum was $267,000. This amount was divided by five  evidently the juror who recorded no amount was no longer taken into account  and the erroneous quotient of $53,500 was placed in the verdict.
The implications of such procedure, when the immense importance of the jury system and of the integrity of verdicts are borne in mind, are almost ominous. To begin, it would appear that the juror who used a "zero" or "no" indicated an inclination, if not a desire, to find for the defendant. If such ever became his conviction the unanimity necessary to validity of the verdict was lacking. On the other hand, if it be assumed that the jurors agreed in advance that the quotient would become the amount of the verdict then an error of eight thousand nine hundred dollars, not counting the error in division, was made because the divisor of "five" was used instead of "six".
According to an affidavit of one of the attorneys for the defendant he became suspicious of the verdict immediately it was returned so he went into the jury room with a bailiff and they gathered the slips of paper the jury had obviously used. These were taken to the judge who placed them in an envelope which he sealed and retained until the hearing on the motion *309 for new trial was held more than a month later.
Photostatic copies of the slips are now before us and they show the figures we have already quoted and the addition and division to which we have referred.
It is only fair to say that each of the jurors filed an affidavit that he did not agree in advance that the the quotient obtained by using the divisor "5" would be the amount of the verdict. The one who never set down any amount signed a second affidavit "that after considerable discussion and consideration among themselves, the jurors agreed to award the plaintiff damages by agreeing to and adopting the following plan: That each of the jurors put on a piece of paper the amount he was willing to award in damages, and that these several amounts be added up and divided by the number of jurors for the purpose of ascertaining the average, and this average was to be accepted as the verdict."
We recently had occasion to review the law on the general subject of verdicts reached in a manner resembling that followed in the present case. Marks v. State Road Department, Fla., 69 So.2d 771. In the opinion, Mr. Justice Drew quoted at some length from a decision of the Supreme Court of Iowa in Wright v. Illinois & M. Tel. Co., 20 Iowa 195, 210.
The pronouncement of the Iowa court, approved by us, defined cases where affidavits of jurors may, and may not, be used to avoid a verdict. The course may be followed to show occurrences in the jury room which do not "essentially inhere in the verdict itself." Illustrations given by the Iowa court of matters not inherent in the verdict were the determination "by aggregation and average or by lot, or game of chance or other artifice or improper manner." To receive proof of such conduct would, according to the Iowa court, "have a tendency to diminish such practices and to purify the jury-room, by rendering such improprieties capable and probable of exposure, and consequently deterring jurors from resorting to them * * *." (Italics supplied.)
In the case decided by this Court, Marks v. State Road Department, supra, we held that to amount to a quotient verdict the jurors must have agreed beforehand that when the sums set down by each were added and then divided "by the number of jurors" the amount thus arrived at would be the amount of the award.
We are not disposed to retract the definition but it does not follow that because six of the jurors signed identical affidavits that there was a discussion among them as to the amount of the verdict after the addition and division had taken place, although one of them  the juror who offered no figure at all deposed a few days after the trial that there was an agreement before the computation was made that the quotient should constitute the verdict  that a true verdict was rendered. If we accept later affidavits and disregard the earlier affidavit of the one juror, the procedure would not fall strictly within the definition of "quotient verdict" but it remains a significant circumstance to be considered in connection with the method of "aggregating" and "averaging" and the propriety of the process used.
And there is much difference between the immediate case and the one just decided. There the judge took great pains to inquire of each juror whether the verdict reflected his independent conclusion on the value of each parcel of land in the action, one to condemn many tracts for right-of-way for a state road. It was after this careful examination that an effort was made to impeach the verdict.
No such examination occurred in the instant case; no poll of the jurors was conducted. We hasten to say that this is no reflection whatever on the judge who tried the case for the evidence of the unusual procedure was not discovered until the jury had been discharged and the curiosity of the judge was obviously not aroused as it was in the former case.
*310 We are of the view that the irregular method of setting down figures, dividing them by five and reporting the result to the court a little more than an hour after retirement is not the approved way of arriving at a verdict, especially in a case that required four days to try, and involved a claim of over one hundred thirty thousand dollars, and that the irregularity was not cured simply because the juror who was conspicuously non-committal and non-participant sat mute when the verdict was received by the court.
At the conclusion of the testimony each party submitted the form of the verdict he expected the jury to return. The one prepared by the appellee bore the following language after the space provided for the amount of damages the jury fixed: "with interest at the legal rate from May 22nd, 1950, the date of the last sale of tomatoes." Originally the judgment included the interest, then the judge, upon the motion for new trial, ordered a remittitur of all interest.
Upon cross assignment of error the appellee challenges this ruling of the court.
In actions growing out of contract and in some actions in tort we have approved the recovery of interest from the time of accrual of the cause of action, but in personal injury cases we have consistently declined to approve interest before entry of judgment. Zorn v. Britton, 120 Fla. 304, 162 So. 879. Decision of the point now presented depends upon the similarity of the elements of damage in personal injury cases and in cases where the claim is based on varietal difference in seeds, that is, the difference between the net value of crops that would have been produced and the crops that were actually harvested. Corneli Seed Co. v. Ferguson, supra.
Apparently an exception to the allowance of interest has been made in personal injury cases because of the speculative nature of some items of damage, such as mental anguish, and the indefiniteness of items such as future pain and suffering. Farrelly v. Heuacker, 118 Fla. 340, 159 So. 24. See also Penny v. Atlantic Coast Line R. Co., 161 N.C. 523, 77 S.E. 774, Ann.Cas. 1914D, 992.
We cannot find in the present controversy the elements, speculative as the damages may appear, that would warrant a decision holding that no interest was recoverable at the time of the verdict so we conclude that the judge erred when he eliminated that part of the recovery.
The judgment is reversed and the cause is remanded for a new trial of all issues.
Reversed.
ROBERTS, C.J., and TERRELL and MATHEWS, JJ., concur.
SEBRING and DREW, JJ., dissent.
HOBSON, J., not participating.
DREW, Justice (dissenting).
I find myself wholly unable to agree with my brother, Justice THOMAS, that the verdict in this case should be set aside because of the events which the opinion in this case states transpired in the jury room.
This was a complicated and difficult case. The evidence as to damage covered a great range. The trial consumed four days and the record contains nearly 1,000 pages of testimony. This case has now been before this Court on three distinct occasions with complicated issues handled by competent and able counsel. After the jury had been charged and had retired to the sanctity of the jury room, it is evident that there had to be a great divergence of opinion as to the ultimate disposition of the cause by them. In this, as in every other case where there is conflicting evidence on the amount of damages, the jury had to have some point of beginning in their discussions.
In the everyday business world where two or more are gathered for the purpose of reaching decisions, many preliminary negotiations and arguments are bound to *311 take place. I can imagine no more normal procedure than that which took place when this jury retired to consider its verdict. In every affidavit presented to and considered by the lower court, including the affidavit of the Juror Adams attached to the motion for new trial, it is conclusively established that when the jury retired all members promptly agreed that the plaintiff was entitled to recover damages in the litigation. Not one single juror questions this. Not one single juror disagrees with the statement that after some preliminary discussion each of the five jurors wrote down a figure on a piece of paper which represented his idea of what the plaintiff would be entitled to recover. Each of the jurors agreed that the amounts were added, divided by five, and the resulting figure of $53,400 was used as the basis for discussion. Each of the jurors agreed that after further discussion all six jurors had agreed that plaintiff's damages were the sum of $53,500. Each of the jurors agreed  with the explanation hereafter noted  that there was no agreement in advance or at all that the several jurors would be bound by the amount determined from the division of the sum of the individual figures.
The Juror Adams in an affidavit which was attached to the motion for new trial and which was dated July 3, 1953, stated that all of the jurors agreed that the plaintiff was entitled to recover and that each of the jurors would write down his idea of the amount of damages and that the several amounts would be added up and divided by the number of jurors and that this average was to be accepted as the verdict; that such was done although he, the Juror Adams, did not write down a figure and did not know by what number the total was divided. He further stated that the amount of the verdict was not the amount of damages that he thought should be awarded and that he would not have agreed to the verdict had he not felt bound by the preliminary agreement. This same Juror Adams, however, in an affidavit dated July 20, 1953, repudiated most of the former affidavit and agreed entirely with the conclusions set forth in the affidavits of the other five jurors, setting forth the facts as hereinabove related. Under the circumstances, the latter affidavit is the only one worthy of belief.
The lower court considered these affidavits and found as a matter of fact that the verdict was not a quotient verdict. I think there is not only ample support in the record for that finding but that there is utterly no competent evidence in the record which could support any other finding.
Untold harm would be done to the jury system if we were to hold that a verdict rendered in the manner in which this verdict was rendered was illegal and void. It would completely hamstring the jurors in their deliberations. It would subject jurors to such constant harassment and embarrassment that it would be even more difficult than it is now to procure competent and able jurors in the trials of civil and criminal cases. Moreover, if, after every trial, jurors are going to be followed around with investigators and others seeking affidavits, as was done in this case, when the going gets tough in the jury room it will be a natural inclination for all to agree on a verdict for the defendant and thus avoid any aftermath.
I would affirm the judgment.
SEBRING, J., concurs.

On Rehearing Granted
PER CURIAM.
A rehearing having been granted in this cause and the case having been further considered upon the record and upon briefs and argument of counsel for the respective parties; it is thereupon ordered and adjudged by the Court that the opinion of this Court of May 25, 1954 is adhered to.
ROBERTS, C.J., and TERRELL, THOMAS and MATHEWS, JJ., concur.
SEBRING and DREW, JJ., dissent.
HOBSON, J., not participating.