E. S. I. MEATS, INC., Plaintiff-Appellee-Cross Appellant,

v.

GULF FLORIDA TERMINAL COMPANY & Continental Insurance Company, Defendants-Appellants-Cross Appellees.

CREST IMPORTING CO., INC. & Insurance Company of North America, Plaintiffs-Appellees-Cross Appellants,

v.

GULF FLORIDA TERMINAL CO. & Continental Insurance Company, Defendants-Appellants-Cross Appellees.

H. P. HOOD, INC. and Appalachian Insurance Company, Plaintiffs-Appellees,

v.

GULF FLORIDA TERMINAL CO. and Continental Insurance Company, Defendants-Appellants.

BORDEN, INC., Plaintiff-Appellee-Cross Appellant,

v.

GULF FLORIDA TERMINAL CO. and Continental Insurance Company, Defendants-Appellants-Cross Appellees.

RED CARPET INNS, INC., a Delaware Corporation et al., Plaintiffs-Appellees,

v.

GULF FLORIDA TERMINAL COMPANY et al., Defendants-Appellants.

No. 78–3017.

United States Court of Appeals,
Fifth Circuit.

March 20, 1981.

---

Carson & Guemmer, Gary W. Nicholson, Tampa, Fla., for Gulf Florida Terminal Co. and Continental Ins. Co.

Trenam, Simmons, Kemker, Scharf, Barkin, Frye & O'Neill, William C. Frye, Tampa, Fla., for E.S.I., Crest, H.P. Hood, Red Carpet and INA Appalachian Ins.

Holland & Knight, Paul D. Hardy, Julian Clarkson, Tampa, Fla., for Borden Inc.

Before HENDERSON, POLITZ and WILLIAMS, Circuit Judges.

HENDERSON, Circuit Judge:

This is an appeal from judgments in five non-jury diversity cases consolidated pursuant to Rule 42(a), F.R.Civ.P. The litigation involves damage to perishable food caused primarily by the breakdown of an ammonia-based cooling system in a cold-storage warehouse. The central issue in dispute is the cause of the breakdown. Our review is complicated by the placement of the burden of proof in the liability stage of the trial.

We affirm the findings on causation, but remand to the district court for a recomputation of damages.

The plaintiffs were customers of Gulf Florida Terminal Company, which operated a warehouse for the storage of frozen food in Tampa, Florida.[1] The defendant regulated the temperature by running pressurized ammonia through a closed pipe-system. The warehouse had all necessary licenses, was operated by qualified engineers and had passed all required inspections. On September 29, 1974, the engineer on duty noticed that the flow of ammonia was irregular. He shut down the cooling system, after which he and another engineer discovered a massive ammonia leak. The defendant moved some goods, including those of the plaintiffs, to another warehouse to prevent thawing or spoilage. The plaintiffs filed these suits to recover damages resulting from ammonia contamination and the interruption of refrigeration.

The primary focus at the trial was the cause of the breakdown. The plaintiffs claim that the defendant was negligent in maintaining the refrigeration system. The defendant, on the other hand, contends that it was a case of industrial sabotage.

Metallurgical experts testified that the break was caused by a blow to the pipe, not by stress, fatigue or internal pressure. The outside surface of the broken pipe revealed tool and chisel marks. Just before the incident the defendant's vice-president, who was in charge of the warehouse, dismissed two long-time employees who soon thereafter went to work for a competitor. The defendant suggests that these disgruntled former employees returned and intentionally broke the pipe. To support this assertion it introduced evidence of incidents of vandalism occurring after the breakdown.

The plaintiffs surmised that a heavy piece of ice thawed because of the rising temperatures and fell from the ceiling,

---

1. The insurers of the defendant and several plaintiffs are also parties to these cases. The terms "defendant" and "plaintiffs" do not comprehend the insurance companies except where the context indicates otherwise.

striking the pipe and causing a fracture at its weakest point, *i. e.* the joint. (Several large pieces of ice were seen on the floor in the vicinity of the break.) The plaintiffs dispute the industrial sabotage contention of the defendant, theorizing that the tool marks on the outer surface of the pipe resulted from its removal for inspection and repair. They claim that the surface scratches were made when the pipe was warm, probably after it broke. The plaintiffs point out that it would have been difficult to chisel through the pipe in such close quarters, and that a trained refrigeration engineer would not have risked serious injury by intentionally cracking open a pipe carrying pressurized ammonia.

The parties agree that a warehouseman is not liable to his bailor for damage he could not have prevented by the exercise of reasonable care. *Cf.* Fla.Stat.Ann. § 677.7–204(1).[2] Security at the warehouse was adequate, so the defendant would not have been liable for the consequences of an intruder's acts. On the other hand, the defendant seems to admit that a careful warehouseman would not have permitted accumulated ice to break the pipe. A threshold issue in this case concerns the allocation of the burden of proving the cause of the incident and, thus, whether the damage resulted from the defendant's failure to exercise due care.

"Burden of proof" usually means either (1) the burden of offering enough evidence to avoid summary judgment, and the order in which evidence is presented; or (2) the risk of non-persuasion, "in the sense that if [the decision maker], after all [is] said and done, remains in doubt" the party with the burden has failed to carry the issue. 9 Wigmore on Evidence § 2485 at 272; *cf. Holloway v. McElroy,* 632 F.2d 605, 641 n. 56 (5th Cir. 1980) (assigning burden of persuasion on defendant allows conviction when "exactly as likely as not" a defense is available). Florida has amended the Uniform Commercial Code to place the burden of establishing negligence on one side or the other according to the value of the bailor's claim. *See* Fla.Stat.Ann. § 677.7–403(1)(b) (1980 Supp.).[3] The Florida statute deals with the burden in the second sense; the bailor with damages of more than $10,000.00 bears the burden of proving negligence.[4] A bailor with less than $10,000.00 in damages establishes his prima facie case by showing delivery offfgoods to a warehouse and redelivery in damaged condition. The question of care only arises if the warehouseman raises it as an affirmative defense. A bailor *suffering* damage in excess of $10,000.00 can recover only if he shows that his bailee failed to exercise the required care.

In its answer to the complaint, Gulf Florida alleged, as an affirmative defense, that it had exercised "such care as a reasonably careful man would exercise under like circumstances" (quoting the standard of care mandated by Fla.Stat.Ann. § 677.7–204). It subsequently moved to delete this defense, insisting that § 677.7–403(1)(b) placed the burden of proving negligence on the plaintiffs since their individual claims exceeded $10,000.00. The district court denied leave to amend, concluding that the statute violates the equal protection guarantees of

---

2. "A warehouseman is liable for damages for loss of or injury to the goods caused by his failure to exercise such care in regard to them as a reasonably careful man would exercise under like circumstances but unless otherwise agreed he is not liable for damages which could not have been avoided by the exercise of such care."

3. "The bailee must deliver the goods to a person entitled under the document who complies with §§ (2) and (3), unless and to the extent that the bailee establishes any of the following ... Damage to or delay, lost or destruction of the goods for which the bailee is not liable, but the burden of establishing negligence in such cases when value of such damage, delay, loss or destruction exceeds $10,000 is on the person entitled under the document."

4. *Section 677.7–403(1)(b) (1980 Supp.) shifts the "burden of establishing negligence."* " 'Burden of establishing' a fact means the burden of persuading the triers of fact that the existence of the fact is more probable than its nonexistence." Fla.Stat.Ann. § 671.1–201(8).

both the United States and Florida Constitutions. The court reasoned that a classification based on a bailor's wealth (more precisely on the value of his claim) bears no rational relationship to any permissible legislative purpose.

Since the ruling of the district court, the Supreme Court of Florida, in an interlocutory appeal of a case also arising out of the Gulf Florida warehouse breakdown, held the statute constitutional. *Reserve Insurance Co. v. Gulf Florida Terminal Co.*, Fla., 386 So.2d 550 (1980).

■ Despite the difference in the opinions of the district court and the Supreme Court of Florida, we should not reach this constitutional controversy when it is not necessary to do so. *E. g. Clay v. Sun Insurance Office*, 363 U.S. 27, 80 S.Ct. 1222, 4 L.Ed.2d 1170 (1960). We are satisfied that the district court's decision on the constitutionality of § 677.7–403(1)(b) (1980 Supp.), right or wrong, did "not affect the substantial rights of the parties," so we do not, and indeed cannot, decide the question. F.R. Civ.P. 61.

If § 677.7–403 only dealt with the burden of producing some evidence of care, or lack thereof, the district court's decision would have had no effect in this case, where both sides concentrated on negligence.[5] Although the Florida statute speaks of the ultimate burden of proving negligence, the district court seems to have treated the issue as strictly procedural.

In holding the statute unconstitutional, the district court did not articulate its understanding of the consequence of shifting the burden;[6] it simply stated that discrimination on the basis of wealth is invalid.

The timing of the order, however, suggests that the court was considering only the duty to come forward with some evidence and the order of presentation, not the risk of non-persuasion. (*Viz.*, the issue was not raised during the trial of the case, but in response to a motion to amend the pleadings.[7])

The judge who declared the statute unconstitutional did not try the case. The trial judge seems to have considered the question to be irrelevant to the merits, stating as much several times. For example, at the close of the defendant's case-in-chief he said: "I tell you know, most of those statements of the appellate courts refer to the proposition of instructions to a jury.... How you leave the case to the jury.... But you have a nonjury case here. We have to try it on all the evidence." However, at one point the judge said that the defendant was "bound to exonerate" itself and show the damage was not its "fault," remarks which may be interpreted as placing the burden of proof on the defendant.

Had this been a jury trial, the charge of the court would have been a clear indication of who bore the ultimate burden of proving negligence. But this case was tried to a judge, so we do not have an instruction expressly placing the risk of non-persuasion. We do, however, have an extensive statement of the judge's findings of fact, which demonstrates that even the placement of the risk of non-persuasion (as opposed to the order of proof) made no difference in the trial. In the view of the trial judge, this evidence did not present a close case. The court stated in the final order:

> The credible evidence is that the break in the pipe where it occurred was caused

---

**5.** "The important practical distinction between these two senses of 'burden of proof' is this: The risk of non-persuasion operates when the case has come into the hands of the jury, while the duty of producing evidence implies a liability to a ruling by the judge disposing of the issue without leaving the question open to the jury's deliberations."
9 Wigmore on Evidence § 2487, at 284.

**6.** The order did not cite § 671.1–201(8). See note 4.

**7.** The decision allocating the burden of proof was noted in the final order, but only as part of long quotation from the plaintiffs' brief. Order at 7. Even that reference spoke of "the burden of going forward with the evidence." Order at 8.

by the large chunks of ice which accumulated on the walls and ceiling of the storage room some of which weighed 200 pounds which *without a doubt* caused the break in the piping system. . . .

\* \* \* \* \* \*

*Based on all the evidence* as to the cause of the break, the Court must reject defendant's contention on this point, and the Court accepts plaintiffs' counsel's summary of the evidence. . .

Order at 10–11 (emphasis supplied).[8]

■ In summary, we are satisfied that the district court's treatment of § 677.7–403 had no effect on its decision. It seems likely that the court saw the problem as nothing more than a matter of pleading. In any event, it is obvious that the trial judge was certain that the break in the pipe, and the resulting damage to the plaintiffs' property, was caused by the defendant's failure to exercise due care. Where there is little doubt about a fact, the burden of proving it is of little consequence.

■ Alternatively, the defendant argues that the court erred in finding the warehouse management negligent. This contention is without merit. The trial court's finding of the cause of the breakage is amply supported by the record.

Much of the testimony on the cause of the breakdown came from expert witnesses. The defendant insists, without explanation, that its expert evidence was superior to that offered by the plaintiffs. Of the four experts who testified, only one was of the opinion that the break was best explained as a case of sabotage. Even his testimony was equivocal. The clear weight of the evidence favored the conclusion that falling ice broke the pipe. To the extent that there was conflicting evidence, the court's

acceptance of the plaintiffs' theory was not clearly erroneous.

■ The district court awarded damages equal to the fair market value of undamaged goods at the time the plaintiffs were able to retrieve their property, with adjustments for salvage value, preservation expenses, etc.[9] The proper measure of damages in Florida is actual damages. *Cf. Allied Van Lines, Inc. v. McKnab*, 331 So.2d 319 (Fla.App.1976), *aff'd*, 351 So.2d 344 (Fla.1977) (loss of personal property). Borden insists that its damages should have been computed on the basis of its original costs instead of market value at the time of recovery (the market price was falling). Borden refers to no Florida cases, and those cases cited from other jurisdictions are not on point. Had there been no damage Borden would not have been able to realize its purchase price by selling the goods because of the price drop, and it cannot profit from the defendant's negligence. Therefore, we affirm the judgment appealed by Borden.

■ Both E.S.I. and Borden stored Australian beef. E.S.I. had no importing license so, consequently, it had to purchase its beef on the domestic market. The district court used the price at which Borden could secure replacement (*i. e.* $1.03 per pound) in computing E.S.I.'s recovery. This was error. E.S.I. introduced evidence that in September and October of 1974 it was buying beef for between $1.2237 and $1.2884 per pound.[10] On remand the court should recompute damages based on E.S.I.'s replacement cost on the date of loss.

Crest stored frozen whiting fish which had been purchased for $.15 per pound. The only evidence of the value of wholesome whiting on September 29, 1974, came from Crest's chief accountant, who testified that Crest was then selling the fish at $.18

---

8. The court then quoted and adopted several of the plaintiffs' proposed findings of fact as to the details of the fracture.

9. No one challenges the propriety of these adjustments.

10. In its reply brief Gulf Florida suggests that the proper figure is $1.2798, E.S.I.'s cost in late August. Brief at 19. This was no longer the going price at the time of the accident.

per pound (although he introduced an August, 1974, invoice of a sale at $.19 per pound). Like Borden, Crest's damages should not have been calculated on the basis of its cost. On remand the court should determine the fair market value of undamaged whiting on September 29, 1974, (presumably between $.18 and $.19 per pound), and compute Crest's damages accordingly.

The fish was packaged in about 14,000 cardboard cartons, each containing four ten-pound blocks of frozen whiting inside an open plastic bag. The warehouse receipt described the shipment as "13,775 ctns frz fish recd in apparent good order except 440 ctns, with flaps open. 136 ctns (554) 10# blocks of fish with no Master ctns—25% of 10# blocks not in poly bags. Every open ctn inspected showed evidence of freezer burn on end of block due to poly bags open on one end."

After the fish was placed in the warehouse an independent marine surveyor inspected it for the steamship agents employed by the vessel that delivered the fish to Tampa. He reported in a letter that none of the bags was sealed, and that normal handling had opened the bags "in some instances ... [which] has therefore resulted in the ends of fish becoming dehydrated and/or freezer burned in several instances." At the trial the surveyor testified that the condition of the fish was worse than the warehouse receipt indicated. When asked "how many of the cartons were bad" he responded "If I recollect correctly, sir, there was something like ten percent of the shipment was affected and in a poor condition." [11]

Some of the whiting was sold to a fish dealer, but it was refused and returned to

the warehouse on September 16, 1974. The consignee rejected the fish because of its bad condition. The receipt issued upon its return to the warehouse noted this exception: "ctns mashed—torn—many wet. Many broken on corners & w/flaps open. Some inner pkgs open & fish exposed. Product has very noticeable odor."

■ The court reduced Crest's recovery by 25 percent to reflect the damage due to faulty packaging. Although reduction is appropriate, we agree with Crest that it should not exceed ten percent of the value of undamaged whiting.

Crest contends that the warehouse receipt is a complete and unambiguous contract not to be varied by the surveyor's testimony. It maintains that the maximum reduction should be three percent because, according to the warehouse receipt, only 440 of the 13,911 cartons (three percent) were damaged. The receipt does not disclose that all the fish, except that in the 440 damaged cartons, was in good condition. Rather, it states that all the fish observed revealed freezer burns [12] and that the other cartons were in "apparent good order." Nothing in the surveyor's letter is inconsistent with the warehouse receipt. See *Wicoma Investment Co. v. Pridgeon*, 188 So. 597, 600 (Fla.1939). However, the surveyor testified only that about ten percent of the fish was damaged because of poor packaging, and there is no testimony of greater damage. It is true that just before the pipe break some spoiled fish was returned to the warehouse, but the evidence discloses that the defendant had not been able to maintain freezing temperatures before the break and the defendant does not suggest that

---

11. He had previously stated that "none of the polyethylene bags were sealed at the mouth, and accordingly the fish was exposed to the cold air. The fish had become freezer burned and discolored on the ends." Thus, it is not clear whether ten percent of the fish was spoiled or ten percent of the cartons were broken.

This witness also inspected the warehouse after the ammonia leak and assisted in the clean-up.

12. The warehouse receipt says "Every open ctn inspected showed evidence of freezer burn...." The surveyor's report to the shipping agent misquoted the warehouse receipt as saying "Every carton that was opened for inspection shows evidence of freezer burn...," and the same language is contained in the agent's report.

poor packaging rendered the fish worthless. From this we must conclude that the evidence will not support a reduction of more than ten percent.

■ Citing "the rule that interest on such claims is to be awarded from the date of damage...." the district court held, as a matter of law, that the "[p]laintiffs are entitled to recover interest from the date they each obtained repossession of their product since that date is the latest date during which damage could have been sustained to the product." Order at 32. The Florida law of prejudgment interest is marbled with sometimes conflicting themes. Although the issue is a difficult one, we agree that in Florida bailors are entitled to interest on awards running from the date their goods are damaged.

The parties are in accord that Florida law governs the question of prejudgment interest in this diversity case. *See Perkins State Bank v. Connolly*, 632 F.2d 1306, 1319–21 (5th Cir. 1980); *Automated Medical Labs, Inc. v. Armour Pharmaceutical Co.*, 629 F.2d 1118, 1125–26 (5th Cir. 1980); *Geyer v. Vargas Productions, Inc.*, 627 F.2d 732, 736 (5th Cir. 1980); *Plantation Key Developers v. Colonial Mortgage Co.*, 589 F.2d 164, 170 (5th Cir. 1979). Most of the states, and the vast majority of those with settled law on the subject, allow bailors to recover interest for the period between damage and trial. See cases cited in Annot., 36 A.L.R.2d 337, 364 (1954) and supplement. Unfortunately, the Florida courts have never considered this particular issue.[13]

To aid our inquiry, we can pick up the history of the Florida law on prejudgment interest with *Sullivan v. McMillan*, 19 So. 340 (Fla.1896). The defendant in *Sullivan* contracted to purchase the plaintiff's entire output of lumber, but refused to accept the remainder after a portion had been delivered. On appeal the buyer urged "[t]hat no interest can be allowed in a recovery of unliquidated damages." The Supreme Court of Florida rejected this contention and held that a properly instructed jury can award interest on the amount of the verdict, commencing with the date the contract should have been completed.

It cannot be doubted that the ancient rule is adverse to the assessment of interest upon unliquidated demands. More liberal ideas as to the allowance of interest prevails [sic] in modern, especially in American, authorities; and in the allowance of interest the distinction is practically obliterated between liquidated and unliquidated demands. A standard author upon the subject says: "... [T]here is no reason, in the nature of things, why the fact of a demand being unliquidated should debar the plaintiff from receiving or exempt the defendant from paying interest.... The objection to this classification lies not only in its difficulty of application, which might perhaps be surmounted; but in the fact of its unfairness.... On general principles, once admit that interest is the natural fruit of money, it would seem that, wherever a verdict liquidates a claim, and fixes it as of a prior date, interest should follow from that date. * * * There are two tests.... Of these the first is whether the demand is of such a nature that its exact pecuniary amount was either ascertained or ascertainable by simple computation, or by reference to generally recognized standards, such as market price.... The subject is without a doubt a difficult one, and the decisions, as have been seen, are not harmonious. But by keeping in mind the fundamental principle, much of the difficulty may be avoided. As soon as it is the legal duty of the defendant to pay, he is liable for

---

13. *Martin v. E.A. McCabe & Co.*, 113 So.2d 879 (Fla.App.1959), was an action brought against a common carrier for damage to a shipper's produce in transit. The court observed that the case was governed by federal law. Without citing authority, it held that "[i]n the event . . . damages are awarded to the plaintiff [on remand], the judgment should bear interest from the date that the damages occurred." 113 So.2d at 882.

interest. . . ." We think the above quotations state the true rule.

19 So. at 342–43 (citing 1 *Sedgwick on the Measure of Damage* §§ 299, 300, 315 (8th ed.). The opinion went on to quote with approval an Alabama opinion, *State v. Lott*, 69 Ala. 147 (1881):

> Interest in this state [*i. e.* Alabama] has long been regarded, not as the mere incident of a debt, attaching only to contracts, express or implied, for the payment of money, but as compensation for the use or for the detention of money. Whenever it is ascertained that at a particular time money ought to have been paid, whether in satisfaction of a debt or as compensation for a breach of duty, or for failure to keep a contract, interest attaches as an incident.

19 So. at 343.

*Jackson Grain Co. v. Hoskins*, 75 So.2d 306 (Fla.1954) was an action for damages growing out of the sale of mislabeled tomato seeds. The plaintiff recovered the difference in value between the crop that was gathered and the one that should have been produced. After an extensive discussion of other issues, the Supreme Court of Florida, en banc, held the plaintiff was entitled to prejudgment interest. Expressing the opinion that damages are very difficult to compute in seed cases, the court nevertheless allowed interest to run from the date the harvest was completed.

The idea that prejudgment interest is a proper item of damages is developed in *Parker v. Brinson Construction Co.*, 78 So.2d 873 (Fla.1955), which held that interest runs on worker's compensation awards from the due date of the first payment. "Interest in the more common acceptation of the term is the cost of hiring money. . . . In the broadest sense, however, interest is often allowed by way of damages, such interest being defined as moratory interest. This form of interest is that amount of money which is customarily allowed in actions ex contractu and in certain tort actions." 78 So.2d at 874.

Under the rule enunciated by the Supreme Court of Florida in *Sullivan*, as developed in *Parker* and *Jackson Grain*, the district court was correct in awarding prejudgment interest here. This comports with the rationale of the Florida cases; a defendant must compensate a plaintiff for depriving him of his property.

The defendant insists that prejudgment interest is recoverable in contract actions but not in tort actions. There are indeed numerous opinions holding that in Florida prejudgment interest is available for actions on a debt arising from a contract. *See, e. g., Snead Construction Corp. v. Langerman*, 369 So.2d 591, 593 (Fla.App.1978); *Geyer; Plantation Key Developers*. These were all contract cases, however, and do not intimate, even as dicta, that prejudgment interest may not be awarded in tort actions. Although *Sullivan* was a contract action, its rationale clearly supports the award of prejudgment interest for the deprivation of property or money. In *Jackson Grain*, the court specifically said, "in actions growing out of contract and in some actions in tort we have approved the recovery of interest from the time of accrual of the cause of action . . .". 75 So.2d at 310. *Parker* quoted this language, underscoring "and in some actions in tort." 78 So.2d at 875–76. These opinions of Florida's highest court demonstrate there is no rule forbidding the award of prejudgment interest in tort cases. Indeed, they imply the contrary. *See also, Srybnik v. Ice Tower, Inc.*, 183 So.2d 224 (Fla.App.), *cert. denied*, 183 So.2d 224 (Fla. 1966) (tortious misrepresentation: "prejudgment interest is allowed on a tortious claim which arises out of a contract.").

■ Even if there were a rule against the recovery of prejudgment interest in tort cases, that would not end our inquiry. Bailment actions lie somewhere between tort and contract, and, in fact, on what might be called the dividing line between them. *See Ellis v. Taylor*, 172 Ga. 830 (1931); Prosser, *Handbook of the Law of Torts* § 92, at 613–16 (4th ed. 1971); *see also Srybnik.*

*But see* 8 C.J.S. Bailments § 1(c) (treating as contract). The claim would not exist but for the agreement between the parties, but at the same time the warehouseman's liability is based on his failure to exercise reasonable care.

The defendant points to a line of cases in the intermediate Florida courts suggesting that "Florida follows the traditional rule of allowing prejudgment interest where a claim is liquidated, but not where a claim is unliquidated." *Town of Longboat Key v. Carl E. Widell & Son,* 362 So.2d 719, 723 (Fla.App.1978).[14] The liquidated damage rule does not serve as a limit on the award of interest, but only governs allocation of the issue between judge and jury. Where the amount of damage (as opposed to the fact of damage—*compare Parker with Snead*) is disputed, it is for the fact finder to assess prejudgment interest, and it is error for the judge to supplement the jury's verdict. *Geyer; Plantation Key Developers; Jackson Grain; Shoup v. Waits,* 107 So. 769 (Fla.1926); *Vacation Prizes, Inc. v. City National Bank of Miami Beach,* 227 So.2d 352, 353 (Fla.App.1969). *But see Nationwide Mutual Insurance Co. v. Griffin,* 222 So.2d 754, 756 (Fla.App.1969) (permitting court to impose prejudgment interest "even though defendant in good faith disputed both the amount and its obligation to pay"). In this case there was no jury and therefore it was proper for the judge, as the fact finder, to grant prejudgment interest. *Snead; Longboat Key. See also Nationwide.*

 Only where there can be no objective evidence of damage is a jury precluded from considering interest. A bona fide dispute over the amount of damage does not prevent the inclusion of prejudgment interest after resolution of the controversy.

In actions growing out of contract and in some actions in tort we have approved the recovery of interest from the time of accrual of the cause of action, but in personal injury cases we have consistently declined to approve interest before entry of judgment. *Zorn v. Britton,* 120 Fla. 304, 162 So. 879. Decision of the point now presented depends upon the similarity of the elements of damage in personal injury cases and in cases where the claim is based on varietal differences in seeds, that is, the difference between the net value of crops that would have been produced and the crops that were actually harvested....

Apparently an exception to the allowance of interest has been made in personal injury cases because of the speculative nature of some items of damages, such as mental anguish, and the indefiniteness of items such as future pain and suffering....

*Jackson Grain,* 75 So.2d at 310. The plaintiffs' damages were determined from market data. Just as in *Jackson Grain,* "We cannot find in the present controversy the elements, speculative as the damages may appear, that would warrant a decision holding that no interest was recoverable at the time of the verdict...." *Id.*

The judgments are AFFIRMED in part and VACATED in part and REMANDED for further proceedings consistent with this opinion.

---

**14.** We note that *Longboat Key,* upon which the defendant places so much reliance, approved prejudgment interest. Moreover, *Longboat Key* recognized that the distinction between liquidated and unliquidated damages is not a clear one, *see also Tampa Electric Co. v. Nash-* *ville Coal Co.,* 214 F.Supp. 647 (M.D.Tenn. 1963); other Florida courts have disparaged the distinction, *Sullivan; Jackson Grain; Vacation Prizes, Inc. v. City National Bank of Miami Beach,* 227 So.2d 352, 353 (Fla.App.1969).