**LONRAY, INC., Plaintiff,**

v.

**AZUCAR, INC., and Fireman's Insurance Company of Newark, New Jersey, a corporation, Defendants.**

No. 81–859–Civ–J–B.

United States District Court, M.D. Florida, Jacksonville Division.

June 27, 1983.

Robert T. Hyde, Jr., Jacksonville, Fla., for plaintiff.

James F. Moseley, Jacksonville, Fla., Walter S. McLin, III, Leesburg, Fla., for defendants.

## OPINION

SUSAN H. BLACK, District Judge.

This cause came on for trial before the Court sitting without jury in Courtroom No. 2, United States Courthouse, Jacksonville, Florida commencing on Monday, February 28, 1983, and concluding on Thursday, March 3, 1983. Counts I and II of the Complaint allege that defendant, either negligently or in breach of its contract with plaintiff, failed to redeliver the same amount of sugar to plaintiff as defendant had accepted for storage in its warehouse. Counts III and IV allege that defendant is liable to plaintiff for certain costs incurred in delays loading the sugar onto barges caused by defendant's negligent or contractual failure to provide sufficient trucks for the load-out. Count V claims entitlement to the unearned portion of the insurance premium covering the sugar during its storage with defendant which was paid for by the plaintiff. The Counterclaim alleges that plaintiff is liable to defendant for costs incurred by defendant to trucking companies for delays in transferring the sugar from trucks to the barges. The Counterclaim also alleges that plaintiff is liable to defendant under the contract for certain warehouse fees which remain unpaid.

Based upon the evidence presented at trial, including the demeanor of the witnesses while testifying, the Court reaches the following findings of fact and conclusions of law.

## FINDINGS OF FACT

Plaintiff is a New York corporation with its principal place of business in New York. Defendant Azucar, Inc. is a Florida corporation with its principal place of business in Florida. Defendant Fireman's Insurance Company of Newark, New Jersey is a citizen outside the State of Florida. Damages exceed the sum of ten thousand dollars ($10,000.00).

### Counts I and II

1. From June 30, 1980, through January 28, 1981, defendant Azucar, Inc. (hereinafter "Azucar") was a corporation engaged in the business of storing goods for hire. Plaintiff's Exhibit 1, testimony of Rubin and Gregg.

2. On June 30, 1980, Azucar entered into an Exclusive Storage and Handling Agreement (hereinafter "Agreement") with plaintiff Lonray, Inc. (hereinafter "Lonray"). Plaintiff's Exhibit 1.

3. From July 8, 1980, through July 29, 1980, Azucar, pursuant to the Agreement, weighed out on Azucar's own scales and then transported by tarpaulin-secured trucks 67,033,840 pounds of raw bulk cane sugar from a warehouse located on Heckscher Drive, Jacksonville, Florida to a warehouse leased by Azucar on Ellis Road, Jacksonville, Florida. Azucar issued individual weight tickets for each truckload which totalled 67,033,840 pounds of sugar and accepted the sugar for storage. Plaintiff's Exhibits 3 and 31. There was no evidence that less than 67,033,840 pounds of sugar was delivered to the Ellis Road warehouse.

4. On July 29, 1980, Azucar had in its warehouse on Ellis Road 67,033,840 pounds of raw bulk cane sugar. Plaintiff's Exhibits 3 and 31.

5. On August 16, 1980, Azucar, pursuant to its agreement with Lonray, weighed out on Azucar's own scales and transported by tarpaulin-secured trucks an additional 920,100 pounds of raw bulk cane sugar from the Heckscher Drive warehouse to the Azucar warehouse located on Ellis Road. Azucar issued individual weight tickets for each truckload, which totalled this 920,100 pounds of sugar, and accepted the sugar for storage. Plaintiff's Exhibits 28 and 32. There was no evidence that less than 920,100 pounds of sugar were delivered to the Ellis Road warehouse.

6. The Court, therefore, specifically finds that after the delivery on August 16, 1980, a total of 67,953,940 pounds of Lonray's sugar had been transported by Azucar to and had been stored in the Azucar warehouse on Ellis Road.

7. Notwithstanding the occasional visits of Markey & Sons to check the sugar, Azucar maintained exclusive custody and control of the sugar stored in its Ellis Road warehouse from the time it was placed there until the time it was removed.

8. Azucar, pursuant to its agreement with Lonray, subsequently loaded and transported the raw bulk cane sugar stored at its Ellis Road warehouse to the pier at the Jacksonville Port Authority terminal at Blount Island for loading onto barges, redelivering the following quantities of sugar on the following dates:

a. over the period November 3 through November 4, 1980, Azucar redelivered 4,710,740 pounds of raw bulk cane sugar to the pier at which two barges named *P–30* and *P–40,* chartered by Lonray, were moored for loading, plaintiff's Exhibits 5 and 33;

b. over the period November 22, 1980, through December 2, 1980, Azucar redelivered 35,305,520 pounds of raw bulk cane sugar to the pier at which the barge named *Bulk Transporter,* chartered by Lonray, was moored for loading, plaintiff's Exhibits 6 and 34;

c. over the period January 19, 1981, through January 26, 1981, Azucar redelivered 15,755,760 pounds of raw bulk cane sugar to the pier at which six barges named *Loveland 5, 6, 7, 8, 9, and 10,* chartered by Lonray, were moored for loading at various times during that period, plaintiff's Exhibits 9 and 35; and

d. over the period January 26, 1981, through January 28, 1981, Azucar redelivered 10,700,360 pounds of raw bulk cane sugar to the pier at which the barge named *ATC–6000*, chartered by Lonray, was moored for loading, plaintiff's Exhibits 9 and 36.

The total amount of raw bulk cane sugar redelivered by Azucar to the pier for loading onto barges chartered by Lonray was 66,472,380 pounds.

9. The difference between the amount of raw bulk cane sugar placed in the Ellis Road warehouse and the total amount of sugar redelivered by Azucar to the pier for loading is 1,481,560 pounds. This was a loss of 2.17% of the total sugar.

10. It is impossible to determine from the evidence exactly when the loss of sugar occurred. Neither party knew of the shortage until the last of Lonray's sugar was loaded out of Azucar's warehouse.

11. There was no evidence of theft or vandalism from the Ellis Road warehouse during the period Lonray's sugar was stored there.

12. There was no evidence of negligence by Azucar in its storage of the sugar.

13. The evidence showed that during the various load-outs of sugar from the Ellis Road warehouse for delivery to Blount Island, the Azucar personnel would scoop up the loose sugar with front-end loaders, and would place it onto a conveyor which would move the sugar onto a truck.

14. The truck bed would be covered and secured by a tarpaulin and the truck would proceed to Blount Island. The Court finds that great care was exercised to avoid any loss of sugar during transportation to Blount Island.

15. The scales used to weigh the sugar at Blount Island belonged to the Jacksonville Port Authority and were operated by Azucar personnel under the supervision of representatives of Markey & Sons, professional weighers and supervisors of commodity transactions. There were no objections at the time by Azucar to the accuracy of these scales. The Court accepts the weight tickets as accurate.

16. There was evidence that the commodities industry recognizes that .75% is a normal loss for the transportation of sugar by barge. There was no evidence of a standard loss per transfer for overland transportation.

17. Even if the Court accepted the applicability of the industry standard for barge transfers of sugar to the instant case involving an overland transfer, the loss accounted for by the standard would only be .75%. *See* Findings of Fact 3–6.

18. The fair market value of raw bulk cane sugar in the nearest market (West Palm Beach, Florida) from November 3, 1980, to January 28, 1981, the period during which sugar was loaded out, was at its highest level on November 5, 1980, when it reached a market value of 43.13 cents per pound. Plaintiff's Exhibit 13.

19. In addition to the value of the lost sugar, Lonray had to pay a dead freight charge of $19.00 per short ton (2000 pounds) for 649.62 short tons, to the charterers of the barge *ATC–6000*, a total of $12,342.78. Azucar contemplated or should have contemplated that Lonray would have to pay such a charge if it failed to redeliver the total amount of Lonray's sugar. Lonray paid the charge for dead freight prior to February 27, 1981, and billed Azucar for such charge on that date. Plaintiff's Exhibits 9, 10, 19, and 36; testimony of Seymour Rubin.

20. It is the standard practice of buyers in the sugar trade to pay a premium to sellers on sugar actually delivered when the polarization, or degree of sweetness of the sugar as measured by its sucrose content which is determined by laboratory analysis, exceeds an industry-accepted standard of 96 degrees. Testimony of Seymour Rubin.

21. The average polarization of the sugar that was shipped out of Azucar's Ellis Road warehouse as measured during the storage period was 98.64°. A polarization of 98.64°, according to standard practice in the sugar industry, equals a premium of

3.39% added to the price per pound of raw bulk cane sugar. Plaintiff's Exhibit 5, p. 3; 6, p. 9; 20, pp. 57, 60, 63, 66; testimony of Seymour Rubin.

22. On July 14, 1980, Fireman's Insurance Company of Newark, New Jersey issued to Azucar a policy of insurance insuring Azucar for any liability it may incur under the law as a warehouseman. Plaintiff's Exhibit 30.

## CONCLUSIONS OF LAW

### Counts I and II

1. Azucar, from June 30, 1980, through January 29, 1981, was a warehouseman as that term is defined in Fla.Stat. § 677.-102(1)(h) (1979).

2. Under the common law, a bailor could establish a *prima facie* case of negligence by showing that goods were not returned in the same condition as they were delivered; however, the bailor continued to have the ultimate burden of proving his case by the preponderance of the evidence. *Reserve Insurance Co. v. Gulf Florida Terminal Co.,* 386 So.2d 550, 551 (Fla.1980).

3. In 1965, Florida adopted Fla.Stat. § 677.403(1)(b), which changed the common law rule to require that the bailee prove that he acted with reasonable care in both negligence and contract cases. *Id.* at 551.

4. In 1971, the legislature amended section 677.403(1)(b) to read as follows:

(1) The bailee must deliver the goods to a person entitled under the document who complies with subsections (2) and (3), unless and to the extent that the bailee establishes any of the following:

    \*    \*    \*    \*    \*    \*

(b) Damage to or delay, loss or destruction of the goods for which the bailee is not liable, but the burden of establishing negligence in such cases when value of such damage, delay, loss, or destruction exceeds $10,000 is on the person entitled under the document.

5. The Supreme Court of Florida has held that this provision shifted the burden of proving a bailee's negligence back to the bailor where the damages exceed $10,-000.00. *Reserve Insurance Co.,* 386 So.2d at 551.

6. The bailor's burden of establishing negligence requires that it persuade the trier of fact that the existence of the fact is more probable than its nonexistence. Fla. Stat. § 671.201(8).

7. This burden of proof means that at the close of all of the evidence the bailor has the "risk of non-persuasion, 'in the sense that if [the decision maker], after all [is] said and done, remains in doubt' the party with the burden has failed to carry the issue." *E.S.I. Meats, Inc. v. Gulf Florida Terminal Co.,* 639 F.2d 1348, 1351 (5th Cir.1981), *quoting,* 9 Wigmore on Evidence § 2485 at 272.

8. This Court holds that under *Reserve Insurance Co.,* the common law requirements of proof have been reinstated for bailors claiming damages in excess of $10,000.

9. Under the common law of Florida, a bailor establishes a *prima facie* case of negligence by showing delivery of the goods to the bailee, a bailment for hire, and failure of the bailee to redeliver the goods in the same quantity and condition. *Marine Office-Appleton & Cox Corp. v. Aqua Dynamics, Inc.,* 295 So.2d 370 (Fla. 3d DCA 1974).

10. The bailee must then come forward and present some evidence which would legally excuse nondelivery. *Stegemann v. Miami Beach Boat Slips,* 213 F.2d 561, 564–65 (5th Cir.1954).

11. The bailee's burden, however, is merely that of producing some evidence. Under the common law, the bailor continued to have the burden of proving his case by a preponderance of the evidence. *Marine Office-Appleton & Cox Corp. v. Aqua Dynamics, Inc.,* 295 So.2d at 370.

12. The Florida version of the Uniform Commercial Code, Fla.Stat. § 677.403(1)(b), is not to the contrary. The code places the ultimate burden of proof upon the owner of the bailed goods, *E.S.I. Meats, Inc.,* 639 F.2d

at 531, but this burden does not even arise until the bailee establishes some reason which would legally excuse non-delivery. *See J. Aron and Company, Inc. v. Service Transportation Co.,* 486 F.Supp. 1070 (D.Md. 1980) (interpreting the effect of the code language placing the "burden of establishing negligence" on the bailor).

13. The bailee must explain the circumstances of the loss of the bailed goods upon pain of being held liable for negligence. *I.C.C. Metals, Inc. v. Municipal Warehouse Co.,* 50 N.Y.2d 657, 431 N.Y.S.2d 372, 378, 409 N.E.2d 849, 844 (N.Y.1980) (interpreting the same code section). The explanation proffered by the bailee must be supported by sufficient evidence and cannot be merely the product of speculation and conjecture. It is not enough to show that the bailee used reasonable care if "mysterious disappearance" is the only explanation given. *Id.* at 377 n. 3, 409 N.E.2d at 853 n. 3.

14. Once the bailee has offered proof of the circumstances of the loss, the burden of production shifts to the bailor to produce sufficient evidence to establish that the bailor's negligence caused the loss. *E.S.I. Meats, Inc.,* 639 F.2d at 1351; *I.C.C. Metals, Inc.,* 431 N.Y.S.2d at 379, 409 N.E.2d at 855.

15. Lonray presented a *prima facie* case of negligent warehousing by proving a bailment for hire, delivery to Azucar of 67,953,940 pounds of raw bulk cane sugar, and redelivery to Lonray of 66,472,380 pounds of raw bulk cane sugar, a difference of 1,481,560 pounds, establishing a presumption of negligence by Azucar. Fla.Stat. § 677.403(1)(b); *see I.C.C. Metals, Inc.,* 431 N.Y.S.2d at 377–78, 409 N.E.2d at 854–55; *J. Aron & Co., Inc. v. Service Transportation Co.,* 486 F.Supp. at 1073.

16. Azucar failed to meet its burden of going forward with evidence explaining the loss of the sugar. *See I.C.C. Metals, Inc.,* 431 N.Y.S.2d at 378, 409 N.E.2d at 855. Azucar's theory that the loss of sugar was "normal" by industry standards for water transfers does not account for the total sugar loss and, therefore, the proffered explanation is insufficient as a matter of law. *See I.C.C. Metals, Inc., id.* at 377 n. 3, 409 N.E.2d at 853 n. 3.

17. Azucar, having failed to meet its burden of going forward with evidence explaining the loss of the sugar, has failed to overcome the presumption of negligence.

18. Because Azucar has failed to overcome Lonray's *prima facie* case of negligence, Lonray has met its burden of proving negligence as prescribed by Fla.Stat. § 677.403(1)(b) (1979); *Reserve Insurance Co.,* 386 So.2d 550; *E.S.I. Meats, Inc.,* 639 F.2d 1348.

19. Azucar's negligent storage of raw bulk cane sugar in its warehouse proximately caused Lonray to suffer damages. As the shortage was unknown to either party prior to the end of the load-out, the Court will award damages equal to the fair market value of the lost sugar on November 5, 1980, the date on which the fair market value of the sugar was at its highest after the sugar was called out by Lonray and during the period of the load-out, 43.13 cents per pound, increased by 3.39% for the average polarization of the sugar, measured while it was stored in the warehouse, totaling $660,658.82, plus $12,342.78 for dead freight charges incurred by Lonray. *Cf. Procter & Gamble Distributing Co. v. Lawrence American Field Warehousing Corp.,* 16 N.Y.2d 344, 266 N.Y.S.2d 785, 213 N.E.2d 873 (N.Y.1965).

20. Fireman's is liable for the full amount of damages due to Azucar's negligent storage of the sugar by virtue of the insurance policy it issued to Azucar.

21. Lonray has moved for and the Court will award prejudgment interest on $660,658.82 from November 5, 1980, to July 1, 1982, at the rate of 6% per annum. Lonray is entitled to prejudgment interest on $12,342.78 from February 27, 1981, to July 1, 1982, at the rate of 6% per annum. Lonray is entitled to prejudgment interest on the total amount of damages from July 1, 1982, to the date of judgment at the rate of 12% per annum. Fla.Stat. § 687.01 (1982); *Par-*

ker v. Brinson Construction Co., 78 So.2d 873 (Fla.1955); *Lawyers Surety Corp. v. Clarke,* 413 So.2d 1260 (Fla. 5th DCA 1982).

## FINDINGS OF FACT

### Counts III, IV, V and Counterclaim

1. On June 30, 1980, Azucar entered into an Exclusive Storage and Handling Agreement (hereinafter "Agreement") with Lonray. Plaintiff's Exhibit 1.

2. In the Agreement entered into with Lonray, Azucar agreed to transport sugar stored by Lonray in Azucar's warehouse at Ellis road to the Jacksonville Port Authority terminal piers at Blount Island for loading onto barges in return for $8.05 per short ton plus a mobilization charge of $2,000.00 on each shipment of sugar from the warehouse to the Jacksonville Port Authority.

3. In section 8(d) of the Agreement, Azucar agreed to commence and diligently pursue to completion the loading out of the sugar upon Azucar's request.

4. By letter dated December 19, 1980, Lonray notified Azucar that a load-out of 6,100 short tons of sugar to the barge *ATC 6000* beginning January 8, 1981, and taking two days would require twenty-two to twenty-three trucks per day. Plaintiff's Exhibit 12.

5. By letter dated November 18, 1980, Lonray notified Azucar that it wanted to begin loading out 17,000 short tons of sugar to the barge *Bulk Transporter* at Blount Island on November 21, 1980, and that it required that the transfer be completed in approximately five days. Plaintiff's Exhibit 12.

6. By comparison of the foregoing two letters from Lonray, the Court has calculated that Lonray's own estimate of the number of trucks required to load 17,000 short tons of sugar onto the barge *Bulk Transporter* in five days would have been an average of twenty-five trucks per day. The testimony established that Azucar supplied to Lonray an average of 24 trucks on each of the six days sugar was loaded out from Ellis Road to Blount Island from November 22, 1980, to December 2, 1980.

7. No loading took place on November 24, 27, 28, 30, and December 1, 1980. The Court finds that no loading took place on November 24 due to rain.

8. The Court finds that the testimony was in conflict and inconclusive as to why no sugar was loaded on November 27, 30, and December 1.

9. The Court finds that no loading of sugar occurred on November 28 because the barge *Bulk Transporter* was not in her berth due to circumstances beyond either party's control.

10. Azucar subcontracted with other companies to provide the trucks to transport Lonray's sugar to Blount Island.

11. There is no provision in the Agreement which requires Lonray to reimburse Azucar for costs incurred for downtime of trucks for delays caused by third parties not under the control of Lonray.

12. The evidence was in conflict and inconclusive to establish an oral contract requiring Lonray to reimburse Azucar for delay caused by third parties.

13. The Court finds that the eight-hour delay in loading the sugar on November 26, 1980, was due to the trimming of the barge *Bulk Transporter* ordered by the Harbor Master and over which Lonray had no control.

14. The Court finds that there was no evidence as to the causes for downtime costs incurred by Azucar in January, 1981.

15. The Agreement requires Lonray to pay Azucar for charges for service other than the costs of ordinary handling and storage.

16. The Agreement requires Lonray to pay Azucar for time a clerk would spend handling and processing warehouse receipts.

17. Cleaning services, electricity, telephone services, and the services of an employee to occasionally monitor the warehouse are costs of ordinary handling and storage and are not extra or special services under the Agreement.

18. The Agreement, in section 15(d), makes Lonray responsible for pest control but does not authorize Azucar to procure pest control.

19. Lonray did not authorize Azucar to order pest control service. Testimony of Seymour Rubin.

20. Lonray reimbursed Azucar for the full Fireman's insurance premium of $24,525.00 on August 14, 1980. Plaintiff's Exhibit 44.

## CONCLUSIONS OF LAW

### Counts III, IV, V and Counterclaim

1. Azucar had a duty under the Agreement to provide sufficient trucks for the transfer of sugar from the warehouse to the Jacksonville Port Authority so that there were no unreasonable delays in the loading of barges.

2. The evidence was insufficient as a matter of law to establish that Azucar breached its contract to provide trucks on November 27, 28, 30, and December 1, 1980.

3. Azucar diligently pursued the loading out of Lonray's sugar within the meaning of the Agreement by providing the required number of trucks per day for the transfer.

4. In accordance with the stipulation of the parties, Lonray is entitled to $8,781.73 as a refund of unearned insurance premium for the policy obtained at Lonray's expense by Azucar pursuant to the Agreement. Pretrial Stipulation at section 2(b).

5. Lonray has moved for and the Court will award prejudgment interest on $8,781.73 at the rate of 6% per annum from August 14, 1980, the date Lonray paid the full premium, to July 1, 1982, a total of $988.85. Plaintiff's Exhibit 44.

6. Lonray has moved for and the Court will award prejudgment interest on $8,781.73 at the rate of 12% per annum from July 1, 1982, to the date of judgment.

7. Under the Agreement between the parties, Lonray has no liability to Azucar for the cleaning services, electricity, telephone services, and guard services charged to it by Azucar between August 29, 1980, and November 12, 1980.

8. Under the Agreement, Lonray is obligated to pay Azucar for all clerical help billed in the invoices reflected in defendant's Exhibit 12. These charges include $432.00 billed on August 29, 1980; $211.85 billed on January 9, 1981; $569.25 billed on September 30, 1980; and $427.80 billed on November 12, 1980, for a total of $1,640.90.

9. Under the terms of the Agreement, paragraph 7 entitled "Late Charges and Interest; Cost," the counterdefendant, Lonray, Inc., owes the counterplaintiff, Azucar, Inc., a 2% late charge for all sums not paid within five days from the due date and interest at the annual rate of 18% for all sums not paid within fifteen days from the due date.

10. Under the agreement between the parties, Lonray has no liability to Azucar for costs incurred by Azucar for down time of its trucks on November 26, 28, or reflected in its bills dated January 27 and January 29, 1981.

## CONCLUSION

For the foregoing reasons, the Clerk shall enter judgment as follows:

1. On Counts I and II the Clerk shall enter judgment against the defendants in favor of plaintiff in the amount of $673,001.60. The Clerk shall also award plaintiff prejudgment interest at the rate of 6% per annum on $660,658.82 from November 5, 1980, to July 1, 1982; and at the rate of 6% per annum on $12,342.78 from February 27, 1981, to July 1, 1982. The Clerk shall further award plaintiff prejudgment interest at the rate of 12% per annum on the total amount of damages, $673,001.60, from July 1, 1982, to the date of judgment;

2. The Clerk shall enter judgment for defendants on Counts III and IV;

3. On Count V the Clerk shall enter judgment against the defendants in favor of plaintiff in the amount of $8,781.73 plus prejudgment interest at the rate of 6% per annum from August 14, 1980, to July 1,

1982; and at the rate of 12% per annum from July 1, 1982, to the date of judgment;

4. On Count I of defendants' Counterclaim, the Clerk shall enter judgment against plaintiff in favor of defendants in the amount of $1,640.90 plus a 2% late charge for all sums not paid within five (5) days from the due date, and interest at the rate of 18% for all sums not paid within fifteen (15) days from the due date; and

5. On Count II of defendants' Counterclaim, the Clerk shall enter judgment for plaintiff.